TRAXLER, Chief Judge:
Intertape Polymer Corporation (“Inter-tape”) petitions for review of a National Labor Relations Board (“NLRB” or “Board”) order concluding that Intertape committed three unfair labor practices pri-' or to and during the course of a union campaign, in .violation of Section 8(a)(1) of the National Labor Relations Act (the “NLRA” or “Act”), 29 U.S.C. § 158(a)(1), and directing that a second election be held based upon two of the three violations. The Board cross-petitions for enforcement of its order in full. For the reasons set forth below, we grant Inter-tape’s petition for review in part and deny it in part, grant the Board’s cross-petition for enforcement in part and deny it in part, and remand for further proceedings.
I.
Intertape operates an adhesive tape manufacturing facility in Columbia, South Carolina. In January 2012, the United Steel, Paper & Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO-CLC (“the Union”), launched a campaign to organize the facility’s production and maintenance employees. The Union filed its representation petition with the Board on March 16, 2012. On April 26 and 27, a secret-ballot election was held. The Union lost the election by a vote of 142 votes against and 97 votes for the Union.
Both prior to and after the election, the Union filed with the Board numerous unfair labor practice charges against Inter-tape. The Union also filed objections to the completed election, seeking to set it aside based upon unlawful conduct allegedly occurring during the “critical period” from March 16, the filing date of the petition, to April 27, the last day of the election. J.A. 26. On July 26, 2012, the Board’s Acting General Counsel issued a complaint against Intertape (the “Complaint”).
Following a hearing, an administrative law judge (“ALJ”) found that Intertape had violated Section 8(a)(1) of the Act by: (1) interrogating employee Johnnie Thames regarding his views about the union; (2) confiscating union literature from an employees’ break room; (3) surveilling employees’ union activities by leafleting at the plant gate at the same time that union supporters were leafleting; and (4) threatening . employees that selecting the union as its collective-bargaining representative would be futile. Based upon the latter three violations, the ALJ also recommended that the election be invalidated and that a second election be held.[1]
On review, the Board agreed that Inter-tape had violated Section 8(a)(1) by unlawfully interrogating Thames in February 2012; unlawfully confiscating union literature from the employee break room in March 2012; and unlawfully surveilling union activities in April 2012 by leafleting at the plant gate during the periods of time *230 that union supporters were leafleting. The Board rejected the ALJ’s finding that Intertape had threatened employees with futility. However, the Board set aside the election results and ordered a new election, based solely upon the confiscation and surveillance violations.[2]
For the following reasons, we conclude that the Board correctly determined that Intertape unlawfully interrogated employee Thames and unlawfully confiscated union materials from the employee break room, but that the Board erred in holding that Intertape engaged in unlawful surveillance of union activities.
II.
On review of orders issued by the NLRB, “we must affirm the Board’s factual findings if they are supported by substantial evidence on the record considered as a whole.” Medeco Sec. Locks, Inc. v. NLRB, 142 F.3d 733, 742 (4th Cir.1998) (internal quotations marks omitted). “Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.” Id. (internal quotation marks omitted). “We must affirm the Board’s interpretations of the NLRA if they are rational and consistent with the Act.” Id. (internal quotation marks omitted).
Under Section 7 of the NLRA, employees are guaranteed “the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection.” 29 U.S.C. § 157.
Pursuant to Section 8(a)(1) of the Act, it is “an unfair labor practice for an employer ... to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7” of the Act. 29 U.S.C. § 158(a)(1). An employer’s actions violate Section 8(a)(1) if “the conduct in question had a reasonable tendency in the totality of the circumstances to intimidate.” NLRB v. Nueva Eng’g, Inc., 761 F.2d 961, 965 (4th Cir.1985).
However, “[t]he prohibition set forth in § 8(a)(1) is limited by [the protection granted by] § 8(c).” J.P. Stevens & Co. v. NLRB, 638 F.2d 676, 684 (4th Cir.1980). Section 8(c) provides that:
[t]he expressing of any views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice under any of the provisions of this Act, if such expression contains no threat of reprisal or force or promise of benefit.
29 U.S.C. § 158(c).
III.
A. The Employee Interrogation Violation
We begin with the Board’s conclusion that Intertape violated § 8(a)(1) by interrogating employee Johnnie Thames in February 2012 about his union sentiments.
Although an employer’s “[questioning or interrogation of employees about their union sentiments is not per se unlawful” under the Act, such questioning *231 will rise to the level of a Section 8(a)(1) violation if it is coercive in nature. Nueva Eng’g, 761 F.2d at 965. “In making a determination of coerciveness, [we] must consider a variety of factors including the history of employer hostility to the union, the nature of information sought, the identity of the questioner, and the place and method of questioning.” Id. at 966. We have also considered whether the questioner “explained the purpose of [the] question” or provided “any assurances against retaliation,” id., and whether the employee was reluctant to discuss unionization, see Standard-Coosa-Thatcher Carpet Yarn Div., Inc. v. NLRB, 691 F.2d 1133, 1137, 1139 (4th Cir.1982).
In December of 2011, Thames was disciplined by his immediate supervisor, Bill Williams, for arguing with Williams. On February 10, 2012, Thames signed a union authorization card. According to Thames, Williams approached him at his work station approximately two or three weeks later and asked him what he thought of the union. Williams also told Thames that “if you don’t think it’s good then, that it can hurt you.” J.A. 234. Thames walked away without responding. Williams denied asking Thames about the union.
The ALJ credited Thames’ “detailed account” of the conversation with Williams and his “strong recall of th[e] discussion,” J.A. 685, over Williams’ “general denial” that any such exchange occurred. J.A. 685-86. The ALJ also found that Williams’ questioning of Thames, under the totality of the circumstances, was sufficiently coercive to have made Thames feel restrained from exercising his rights under Section 7.
The Board balanced the relevant factors and agreed. As noted by the Board:
Williams directly asked Thames to reveal his view of the Union. Although a low-level supervisor, Williams was Thames’ direct supervisor, reasonably tending to make the questioning that much piore threatening. Williams, moreover, offered no justification for his questioning or assurances against reprisals. The preexisting hostility between Williams and Thames and Thames’ unwillingness to answer Williams further weigh in favor of finding a violation. Last, we find that Williams’ comment that “it can hurt you” would have exacerbated the already coercive nature of his inquiry into Thames’ opinion of the Union.
J.A. 679 (internal citations and footnotes omitted).
On appeal, we must accept the Board’s factual findings based on credibility determinations “absent extraordinary circumstances.” WXGI, Inc. v. NLRB, 243 F.3d 833, 842 (4th Cir.2001) (internal quotation marks and alteration omitted). “Exceptional circumstances include those instances when a credibility determination is unreasonable, contradicts other findings of fact, or is based on an inadequate reason or no reason at all.” Id. (internal quotation marks omitted). No such circumstances exist here. The ALJ observed the testimony of Thames and Williams and explained why he credited Thames’ account of the conversation over Williams’ denial that it occurred.
We hold that substantial evidence supports the Board’s determination that Williams’ questioning of Thames about his union sentiments, as described by Thames, was sufficiently coercive or intimidating to render it an unfair labor practice under the Act. Accordingly, we deny Intertape’s petition for review and grant enforcement of this portion of the Board’s order.
B. The Confiscation Violation
We next consider the Board’s conclusion that Intertape violated Section 8(a)(1) by *232 confiscating union flyers that a union supporter had placed in the employee break room.
“Soliciting support for a union and distributing union materials are among the core activities safeguarded by § 7.” Consolidated Diesel Co. v. NLRB, 263 F.3d 345, 352 (4th Cir.2001); see also Beth Isr. Hosp. v. NLRB, 437 U.S. 483, 491-92, 98 S.Ct. 2463, 57 L.Ed.2d 370 (1978) (“[T]he right of employees to self-organize and bargain collectively [under Section 7] necessarily encompasses the right effectively to communicate with one another regarding self-organization at the jobsite.”). “The workplace is uniquely appropriate for such activities, so long as the activities are conducted in nonwork areas during non-work time, and in a non-abusive manner.” Consolidated Diesel, 263 F.3d at 352 (internal quotation marks and citations omitted).
Ordinarily, therefore, “an employer may not confiscate union literature left for distribution to employees in nonwork areas during nonwork time.” Id. at 354. On the other hand, an employer’s enforcement of a valid housekeeping policy that results in the incidental disposal of union literature will not rise to the level of interference with the employee’s protected Section 7 activities. Cf. Standard-Coosa-Thatcher, 691 F.2d at 1141. In other words, an employer “has every right to keep its workplace clean,” but that right will not prevail where “substantial evidence supports the Board’s view that cleanliness was not [the] issue.” Consolidated Diesel, 263 F.3d at 354.
Prior to and during the union campaign, Intertape maintained a solicitation and distribution rule that prohibited such activities during working time and in working areas. Working time was defined as “the time employees are expected to be working and does not include breaks, meals, before the shift starts, and after the shift ends.” J.A. 33. Consequently, the distribution of union flyers in the employee break room was not prohibited.
The Complaint alleged that in March 2012, “including on March 23 and 29,” Supervisor Bill Williams enforced Inter-tape’s distribution rule “selectively and disparately, by prohibiting union distributions in non-work areas, while permitting nonunion distributions in non-work areas.” J.A. 33. At the hearing, employee Faith Epps testified that she placed union flyers on the counter in the employee break room, where such distributions were permitted. Epps testified that on three occasions in March, she observed Williams go into the break room immediately after the employee shift break and remove the flyers. Epps also testified that, prior to thé union campaign, literature left in the break room, such as newspapers and magazines, was left untouched until at least the end of the work day. Epps also testified that she could not recall seeing Intertape supervisors cleaning up or removing literature from the break room until after the union campaign began. Williams admitted discarding the union literature along with the other “[newspapers, magazines, menus,” and trash that had been left in the break room, but he testified that he only did so as a part of his normal housekeeping duties. J.A. 528.
The ALJ found that Intertkpe, through Williams, had unlawfully confiscated union literature from the break room. The Board agreed, and additionally found that Intertape had changed its policy regarding distributions in the break room “as a reaction to and countermeasure against the union campaign.” J.A. 679.
1.
As an initial premise, Intertape argues that the Board erred in finding that *233 it had violated Section 8(a)(1) by confiscating union literature from the break room because the violation was not closely related to the allegation set forth in the Complaint, nor fully and fairly litigated at the hearing. We disagree.
“It is well settled that the Board may find and remedy a violation even in the absence of a specified allegation in the complaint if the issue is closely connected to the subject matter of the complaint and has been fully litigated.” Pergament United Sales, Inc., 296 N.L.R.B. 333, 334 (1989); see Owens-Corning Fiberglas Corp. v. NLRB, 407 F.2d 1357, 1361 (4th Cir.1969) (“All that is requisite in a valid complaint before the Board is that there be a plain statement of the things claimed to constitute an unfair labor practice that respondent may be put on his defense. Such a complaint need state only the manner by which the unfair labor practice has been or is being committed, the absence of specifics being tolerated where there has been no special showing of detriment.”) (internal quotation marks and citation omitted); see also Pergament United Sales, Inc. v. NLRB, 920 F.2d 130, 134 (2d Cir.1990) (“In the context of the Act, due process is satisfied when a complaint gives a respondent fair notice of the acts alleged to constitute the unfair labor practice and when the conduct implicated in the alleged violation has been fully and fairly litigated.”).
Intertape complains because, prior to the hearing, it had only been accused of disparately enforcing its distribution policy, and not of changing its housekeeping policy. With regard to the Pergament test, the Board held that:
Even if [Intertape] is correct that this is not the precise theory of the complaint, which alleged that the Respondent ‘enforced the rule ... selectively and disparately, by prohibiting union distributions in non-work areas, while permitting nonunion distributions in non-work areas,” the issue of a change in the [Intertape’s] practice is closely related to the subject matter of the complaint and has been fully litigated.
J.A. 679 n. 8. The Board additionally found it significant that Intertape “does not argue that lack of notice prevented it from introducing exculpatory evidence or that it would have altered its litigation strategy had the allegation been pleaded in this manner.” J.A. 679 n. 8.
We find no error in the Board’s decision. The allegation in the Complaint and the violation found by the Board both present the core issue of whether Williams’ handling of the union material left by Epps in the employee break room interfered with the employees’ Section 7 rights. From the inception of the Complaint, Intertape knew that the General Counsel would take issue with the manner in which Williams handled the union literature within the narrow time frame specified, and Intertape had ample opportunity to prepare for and rebut the claim that Williams was discarding union literature in a manner that differed from Intertape’s pre-campaign practices. Moreover, Intertape did not claim lack of notice at the hearing, as the testimony evolved, nor did it ask for a continuance in order to present new or different testimony regarding its housekeeping or distribution policies.
Accordingly, we hold that the Section 8(a)(1) confiscation violation was closely related to the allegation set forth in the complaint, and it was fully and fairly litigated at the hearing.
2.
Turning to the merits of Inter-tape’s challenge to the confiscation violation, we hold that substantial evidence sup *234 ports the Board’s determination that Williams’ removal of the union literature from the break room was an unfair trade practice under the Act.
Although Intertape admits that Williams removed union literature from the break room, it asserts that the General Counsel failed to prove that Intertape changed its distribution or housekeeping policies during the critical period or that it did so in response to union activity. We are unpersuaded.
As noted above, Epps testified that literature left by employees in the break room prior to the union campaign was routinely left undisturbed until the end of the day, and that the supervisors were not known to engage in prompt housekeeping activities after each employee break. Her testimony was also corroborated by that of a second employee, John Jordan, who testified that he was told by another supervisor that he could not distribute union literature in the break room.
Because substantial evidence supports the Board’s conclusion that Intertape unlawfully confiscated union literature in violation of the Act, we deny Intertape’s petition for review and grant enforcement of this portion of the Board’s order as well.
C. The Surveillance Violation
Finally, we turn to the Board’s conclusion that Intertape engaged in excessive or coercive surveillance when it handed out leaflets at the plant gate to arriving employees at the same time that union supporters were handing out leaflets. For the reasons set forth below, we hold that the Board’s decision is not supported by substantial evidence and is contrary to law.
1.
The facts pertaining to this violation are largely undisputed. On April 24, two days before the secret-ballot election began, In-tertape supervisors stood near the turnstiles at the plant entrance and distributed a “Thank You” flyer to arriving employees from approximately 6:30 a.m. to 7:00 a.m.[3] No union supporters were leafleting at the time.
That afternoon, Intertape supervisors returned to the plant gate and distributed the flyers from approximately 6:30 p.m. to 7:00 p.m. After the supervisors arrived and began distributing the flyers, union supporters joined them at the gate and began simultaneously distributing union literature. The union supporters positioned themselves approximately five feet on the other side of the turnstiles from the supervisors.
On the morning of April 25, the supervisors returned to the turnstiles and again distributed the flyers from approximately 6:30 a.m. to 7:00 a.m., unaccompanied by thé union supporters. That evening, both the supervisors and the employees distributed their respective flyers from opposite *235 sides of the turnstiles, but on this occasion the union supporters arrived first.
There is no evidence that the supervisors knew that the union supporters intended to hand out leaflets at the gate on the two afternoons in question, or that they were otherwise present at the gate for the purpose of spying on employees. Although union supporters had briefly leafleted at the gate on March 22 and 23, shortly after the representation petition was filed, they had not done so during the intervening month-long campaign. Nor was there evidence that the union supporters had planned ahead of time to leaflet on the afternoons of April 24 and 25. During the periods of simultaneous leafleting, the supervisors did not say anything, beyond pleasantries, to the union supporters or to the arriving employees. They did not take pictures- or notes of the employees as they' arrived, nor did they otherwise engage in threatening or intimidating behavior towards the union supporters or the arriving employees.
The Board, however, held that Intertape engaged in “unlawful surveillance” of the union activities because the supervisors’ leafleting at the gate was “ ‘out of the ordinary,’ ” insofar as there was no evidence that Intertape had communicated with its employees in this manner “prior to the campaign,” and because the supervisors could “see ” the employees during the periods of simultaneous leafleting. J.A. 679 (emphasis added).[4] The Board “attribute[d] no relevance to which group of leafleters arrived first,” because “the employer’s [leafleting] activity [was] out of the ordinary.” J.A. 679 n. 9. As to Inter-tape’s argument that “it was simply exercising its Section 8(c) right to communicate with its employees,” the Board summarily rejected it as well, explaining that “such communication is [nonetheless] unlawful if it includes out-of-the-ordinary conduct that places employees’ union activities under surveillance.” J.A. 679-80.
2.
It has long been established that an employer’s act of observing its employees on company property during union activities, even when done in close proximity to its employees, is not a per se violation of the Act. On the contrary, “union representatives and employees who choose to en.gage in their union activities at the employer’s premises should have no cause to complain that management observes them.” Belcher Towing Co. v. NLRB, 726 F.2d 705, 709 (11th Cir.1984) (per curiam) (internal quotation marks omitted); Emenee Accessories, Inc., 267 N.L.R.B. 1344, 1344, 1349 (1983) (finding no violation where supervisor “stationed himself at the entrance to the building for the purpose of observing the Union’s efforts” and “observed the union organizers conversing with employees who were reporting for work”); Milco, Inc., 159 N.L.R.B. 812, 814 (1966) (finding no violation where manage^ ment representatives watched union organizers who were handing out leaflets and talking to employees as they were leaving the plant; the employer had a legitimate reason for being there and there was “no evidence that any management representa *236 tives made notes or otherwise recorded what they saw,” notwithstanding that they could see the interactions between the employees and the union organizers).
The exception to this general rule arises when the employer’s observation of union activities can be reasonably construed as excessive or coercive surveillance, such that it “unreasonably chill[s] the exercise of the[ ] employees’ Section 7 rights.” NLRB v. Southern Md. Hosp. Ctr., 916 F.2d 932, 938 (4th Cir.1990) (per curiam) (noting that “the Board has on several occasions found that employers unreasonably chilled the exercise of their employees’ Section 7 rights through excessive surveillance”) (emphasis added); cf. Arrow-Hart, Inc., 203 N.L.R.B. 403, 403 (1973) (noting that an employer’s act of “coercively surveilling—that is, spying upon—its employees’ activities” would be a violation of the Act). As stated previously, the employer’s observation must have a “reasonable tendency in the totality of the circumstances to intimidate” the employees. Nueva Eng’g., 761 F.2d at 965.
This is because, “[w]hen an employer watches ... employees because he believes they are engaged in union activities, the employees may reasonably fear that participation in union activities will result in their identification by the employer as union supporters.” Id. at 967. The “employee, possibly anticipating retaliation against identified supporters, may thereafter feel reluctant to participate in union activities.” Id.; see also NLRB v. Grand Canyon Mining Co., 116 F.3d 1039, 1045 (4th Cir.1997) (“[A]n employer violates section 8(a)(1) of the Act if it gives employees the impression that it is conducting surveillance of their union activities.”); J.P. Stevens & Co., 638 F.2d at 683 (“It is an unfair labor practice for an employer to create in the minds of employees an impression that he is closely observing union organizational activity.”). Such excessive or coercive “surveillance becomes illegal because it indicates an employer’s opposition to unionization, and the furtive nature of the snooping tends to demonstrate spectacularly the state of the employer’s anxiety.” Belcher Towing, 726 F.2d at 708 n. 2. “From this the law reasons that when the employer either engages in surveillance or takes steps leading his employees to think it is going on, they are under the threat of economic coercion.” Id.
Ultimately, “[t]he test for determining whether an employer engages in unlawful surveillance, or unlawfully creates the impression of surveillance, is an objective one and involves the determination of whether the employer’s conduct, under the [totality of the] circumstances, was such as would tend to interfere with, restrain, or coerce employees in the exercise of their rights guaranteed under Section 7 of the Act.” Southern Md., 916 F.2d at 938 (internal quotation'marks omitted); cf. Nueva Eng’g., 761 F.2d at 965 (The employer’s conduct must have a “reasonable tendency in the totality of the circumstances to intimidate” the employees.).
For example, we consider “the duration of the observation, the employer’s distance from its employees while observing them, and whether the employer engaged in other coercive behavior during its observation.” Aladdin Gaming, LLC, 345 N.L.R.B. 585, 586 (2005). But we must also consider whether the employer had a legitimate reason for observing the activities or for otherwise being present at the place where the alleged surveillance has occurred. See, e.g., Nueva Eng’g., 761 F.2d at 967 (upholding violation where two supervisors went to an off-site location “for the purpose of surveilling a scheduled union meeting” and, “when no meeting occurred, the supervisors followed three em *237 ployees to an employee’s home”); Sprain Brook Manor Nursing Home, LLC, 351 N.L.R.B. 1190, 1191 (2007) (finding unlawful surveillance where nursing home administrator went to facility on her day off “solely for the purpose of observing union activity” and stood in the doorway closest to where the union organizer was meeting with the employees so as to be able to see the employees and be seen by them); PartyLite Worldwide, Inc., 344 N.L.R.B. 1342, 1342 (2005) (finding unlawful surveillance of union handbilling activities because, “on three separate occasions shortly before the election, no less than eight high-ranking managers and supervisors stood at entrances to the employee parking lot watching the [union] give literature to employees as they entered and exited the parking lot during shift changes,” “the presence of managers and supervisors at the entrances to the parking lot was surprising and an unusual occurrence,” and “[t]he employer established no legitimate explanation for why any of its managers and supervisors were stationed in the parking lot during the [Union’s] handbilling activities”); S.J.P.R., Inc., 306 N.L.R.B. 172, 172 (1992) (finding that the employer “engaged in unlawful surveillance by posting one or two security guards near the employee entrance and another security guard with binoculars in an upstairs hotel room in order to observe employees and union agents soliciting union authorization card signatures across the street from the hotel,” because it “constituted more than ordinary or casual observation of public union activity” and “[t]here [was] no evidence that the [employer’s] conduct was based on safety or property concerns”); Eddyleon Chocolate Co., 301 N.L.R.B. 887, 888 (1991) (finding violation where supervisor “drove his car to within 15 feet of’ the union representative, “watched employees as [the union representative] handed them literature ... near the entrance to the [employer’s] parking-lot,” and “spoke into his car telephone” until the union representative left); Arrow Auto. Indus., 258 N.L.R.B. 860, 860-61 (1981) (finding unlawful surveillance of union handbilling activities where “[s]oon after the handbilling began on 2 of the 3 days ... in question, 11 of the [employer’s] supervisors lined up in varying numbers near each of the three gates, observing the employees as they drove past the union handbillers,” “the presence of the supervisors was highly unusual,” “the supervisors’ presence was deliberately calculated to show and demonstrate observation in numbers and force,” and the employer failed to demonstrate a legitimate reason for being there) (internal quotation marks, alterations, and footnotes omitted).
3.
This case presents an additional and somewhat unusual circumstance for consideration as well because, unlike in the more typical unlawful-surveillance situation, Intertape’s legitimate explanation for being at the gate was to exercise its First Amendment and Section 8(c) right to leaflet its employees during a union campaign in a nonthreatening manner. There was no union activity to observe when they began this protected speech. And when the union supporters joined them in this protected activity, the supervisors and the union supporters engaged in simultaneous but noncoercive speech.
As noted earlier, Section 8(c) of the Act limits the prohibition set forth in § 8(a)(1). See J.P. Stevens, 638 F.2d at 684. “Counterbalancing the [Section 8(a) ] prohibition against” an employer interfering with, restraining, or coercing employees who are engaged in protected Section 7 activities “is [the] employer’s strong interest in preserving its right to free speech,” which “Congress expressly recognized ... by en *238 acting” Section 8(c) of the Act. Americare Pine Lodge Nursing & Rehab. Ctr. v. NLRB, 164 F.3d 867, 875 (4th Cir.1999).
Specifically, Section 8(c) “protects speech by both unions and employers,” Chamber of Commerce v. Brown, 554 U.S. 60, 67, 128 S.Ct. 2408, 171 L.Ed.2d 264 (2008), by providing that such speech “shall not constitute or be evidence of an unfair labor practice under any of the provisions of the Act,” so long as “such expression contains no threat of reprisal or force or promise of benefit,” 29 U.S.C. § 158(c) (emphasis added). Section 8(c) “manifest[s] a ‘congressional intent to encourage free debate on issues dividing labor and management.’ ” Chamber of Commerce, 554 U.S. at 67, 128 S.Ct. 2408; see also NLRB v. Gissel Packing Co., 395 U.S. 575, 617, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969). “[P]ermitting the fullest freedom of expression by each party nurtures a healthy and stable bargaining process.” Americare Pine, 164 F.3d at 875 (internal quotation marks omitted).
Given the competing but protected interests at play, therefore, a “balance [must] be struck between an employer’s free speech rights as protected by subsection 8(c) and employees’ rights to associate freely as embodied in section 7, subsection 8(a)(1), and the proviso to subsection 8(c).” Procter & Gamble Mfg. Co. v. NLRB, 658 F.2d 968, 983 (4th Cir.1981); see also Gissel Packing, 395 U.S. at 617, 89 S.Ct. 1918. The protection is not “a cloak to hide obviously intimidating conduct,” NLRB v. Williams, 195 F.2d 669, 672 (4th Cir.1952), but the fact that the employer is engaged in such protected speech is a relevant factor to be considered.
In Amw-Hart, the Board addressed this interplay between Section 8(a)(l)’s prohibition against coercive or excessive surveillance and Section 8(c)’s protection of an employer’s speech. There, the supervisors’ leafleting activity inside the glass door of the plant likewise placed them in a position where they could see union supporters who were engaged in the very same protected activity outside the glass door. They were also acting in a manner “out of the ordinary,” insofar as they were leafleting their employees near the entrance as part of their campaign against unionization. Nevertheless, the Board found no unfair labor practice because there was no evidence that the supervisors were engaged in coercive surveillance during this counter-leafleting activity. As the Board correctly recognized,
An employer has the right to distribute election campaign material of its own. It has a right to express its opinion of union literature, even calling it trash—in writing as well as orally. And, it has a right to do these things at the very moment the union is trying to persuade the employees to a contrary view—certainly anywhere on its premises, in the inner reaches of the plant or at the front door, even if the door is made of looking-through glass. What the General Counsel’s argument really amounts to here is that the Respondent may not do what it legally is permitted to do.
203 N.L.R.B. at 406; see also Aladdin Gaming, 345 N.L.R.B. at 585-86 (finding no violation where supervisors interrupted union supporters who were soliciting employees in the employer’s cafeteria to give “management’s perspective on unionization” as it had a right to do under Section 8(c)).
4.
Here, in contrast, the Board found unlawful surveillance by the Intertape supervisors merely because the supervisors’ leafleting was “out-of-the-ordinary”—insofar as they had never done it prior to the union campaign—and because the supervi *239 sors could “see” the employees when the union supporters were simultaneously leafleting. J.A. 679. Moreover, the Board declined to give any countervailing consideration to the fact that Intertape was engaged in protected Section 8(c) activity at the time, or to the fact that Intertape was engaged in this activity well before the union supporters arrived to counter-leaflet. This was error.
Plainly, to transform Intertape’s protected Section 8(c) activity into the unlawfully coercive surveillance prohibited by Section 8(a)(1), the Act requires more than mere “out-of-the-ordinary” conduct in an area where employees can be seen; the Act requires conduct that could have reasonably been construed in the totality of the circumstances as coercive, intimidating, or threatening in nature. As our sister circuit has observed, “[i]n recent cases involving employer surveillance of union activities, the Board has seemed to ignore this critical coercion element.” Greater Omaha Packing Co. v. NLRB, 790 F.3d 816, 823 (8th Cir.2015). The same holds true here.
First, the supervisors’ ability to observe employees as they interacted with union supporters on company property during the brief periods of simultaneous leafleting is insufficient to render the supervisors’ leafleting coercive, intimidating, or threatening in nature. See Southern Md., 916 F.2d at 938; Belcher Towing, 726 F.2d at 709. There is no evidence that Intertape’s supervisors engaged in “excessive surveillance” of the union supporters’ leafleting activity during the periods of simultaneous leafleting or, for that matter, that they were “watching” them at all. Nor is there any indication that they continued to leaflet on the two afternoons in question in order to spy on or snoop into the employees’ union activities.
Second, the Board placed too much significance upon the fact that Inter-tape had never leafleted its employees at the plant gate prior to the union campaign. Although an employer’s act of observing employees in a way that is “out of the ordinary” can provide evidence that incidental observation, in the totality of the circumstances, should instead be construed as coercive or intimidating surveillance or spying, not every “out of the ordinary” activity by an employer can be deemed, a fortiori, coercive or threatening in nature. See, e.g., Southern Md., 916 F.2d at 939 (“It is firmly established that management officials may observe public union activity,® particularly where such activity occurs on company premises, without violating § 8(a)(1) of the Act, unless such officials do something ‘out of the ordinary.’ ”); Aladdin Gaming, 345 N.L.R.B. at 585-86 (while a “supervisor’s routine observation of employees engaged in open Section 7 activity on company property does not constitute unlawful surveillance,” the exception arises when “an employer ... surveils employees engaged in Section 7 activity by observing them in a way that is ‘out of the ordinary’ and thereby coercive”). On the contrary, the cases have always considered the employer’s reason for being in a particular place at a particular time, even if it is unusual or out of the ordinary, and the Act’s requirement that there be indicia of coercion or intimidation requires no less. See Arrow-Hart, 203 N.L.R.B. at 406 (“If, as they approached the front door to reach some of the employees, the supervisors also ... saw their counterparts giving out their election material, it was something that could hardly be avoided in any event. It would be childish to call this spying, for if there is one thing everybody knew all the time it is that the [union] was distributing outside and the Company inside.”).
Here, Intertape was arguably not engaged in “out-of-the-ordinary” behavior at *240 all, because by the time the union supporters arrived to counter-leaflet alongside them, the supervisors had already leafleted at the gate on one occasion and were into their second session. The fact that they had never leafleted employees prior to the union campaign also adds nothing to the coerciveness inquiry. The union campaign itself was “out of the ordinary,” in that the Union was attempting to unionize Inter-tape’s workforce. That Intertape responded to this out-of-the-ordinary event by engaging in leafleting for the first time does not make its actions suspect. Rather, in light of the union campaign, the employer’s decision to present its views through its own gate-side leafleting seems entirely ordinary.
Nevertheless, even if we were to consider the supervisors’ presence at the gate to be “out of the ordinary,” it is not the type of “out-of-the-ordinary” observation or conduct that the Board or the courts have reasonably viewed as being coercive or intimidating in nature. Nor would the language of the Act allow for such an over-inclusive definition.
As in Arrow-Hart, “[w]hat the General Counsel’s argument really amounts to here is that the [employer] may not do what it legally is permitted to do” under Section 8(c). Id. Indeed, by accepting this argument, the Board is effectively requiring employers to cease engaging in protected conduct whenever union supporters choose to engage in identical, protected conduct alongside them. The Act, however, explicitly protects the employer’s right to express its viewpoint in this manner, and that right cannot be extinguished absent a “threat of reprisal or force or promise of benefit,” 29 U.S.C. § 158(c), which is nonexistent here. Similarly, Intertape’s mere act of simultaneous leafleting, even if such leafleting is construed as “out of the ordinary,” is plainly insufficient to establish the intimidation or coercion required under Section 8(a)(1).
Here, the Intertape supervisors did not go to a place where union supporters or other employees were engaged in union activities for the purpose of “spying upon” them, either from afar or up close. They went to a gate on company property, where there were no union supporters and no employees engaged in union activity, in order to exercise their First Amendment and statutorily protected right to communicate their views about the upcoming election to their employees. During the two short periods of simultaneous leafleting, the Intertape supervisors did not speak to the employees or the union leafleters, beyond exchanging pleasantries. There is no evidence that they stared or glared at the employees or the leafleters. There is no evidence that they attempted to force their leaflets upon the employees, or that they attempted to persuade employees or signal to them that they should not accept the union leaflet in addition to dr in lieu of the employer’s leaflet. They did not take photographs or otherwise record what was transpiring during the brief periods of simultaneous leafleting. And there is no evidence that they otherwise engaged in behavior that could reasonably have been construed as coercive, intimidating, or threatening.
Under the totality of the circumstances — which includes the absence of any threatening expression that could have extinguished Intertape’s Section 8(c) right to leaflet at the gate — Intertape’s legitimate reason to be there did not vanish when the union supporters arrived to counter-leaflet, nor were the Intertape supervisors required to retreat when the union supporters did arrive. The Intertape supervisors were required to conduct their leafleting activity in a noncoercive and *241 nonthreatening manner, and there is no indication that they did not do so.
For the foregoing reasons, we hold that substantial evidence does not support the Board’s conclusion that Intertape engaged in unlawful surveillance when it leafleted at the gate on the afternoon of April 24, when the Union supporters chose to leaflet alongside them, or on the afternoon of April 25, when Intertape chose to continue its leafleting activities in advance of the election. Accordingly, we decline to enforce this portion of the Board’s order.
IV.
To conclude, we grant Intertape’s petition for review in part and deny it in part, and we grant the Board’s cross-petition for enforcement in part and deny it in part. Specifically, we enforce that portion of the Board’s order concluding that Intertape engaged in unlawful interrogation of an employee in February of 2012, as well as that portion of the Board’s order concluding that Intertape unlawfully confiscated union flyers in March of 2012. However, we deny enforcement of the Board’s order concluding that Intertape engaged in unlawful surveillance of union activity in April of 2012, and remand to the Board so that it can modify its Order in accordance with our decision. Because our decision eliminates one of the two bases upon which the Board set aside the election, see supra at 229-30 & n. 2, the Board will also find it necessary to reconsider its decision to direct a second election.

PETITION FOR REVIEW GRANTED IN PART- AND DENIED IN PART; ENFORCEMENT GRANTED IN PART AND DENIED IN PART; REMANDED.

. Because the single incident of unlawful interrogation of Thames occurred before the Union filed its representation petition, it was not objectionable conduct occurring within the critical period or a basis for setting aside the election.

. Board member Miscimarra dissented in part. He would have dismissed the interrogation and surveillance allegations. He would also have certified the election result because Intertape’s alleged misconduct, even if it included the purported surveillance, was “ 'so minimal or isolated that it [was] virtually impossible to conclude that the misconduct could have affected the election results.’ ” J.A. 682 (quoting Longs Drug Stores Cal., 347 N.L.R.B. 500, 502 (2006)).

. The flyer was signed by plant supervisors and contained the following message:
Soon, you will be able to vote on whether you want to be represented by a union or not. Although we do not have a vote, we have tried to give you the information you need to make a good decision. We hope you will base your decision on the facts and what you truly believe will put this plant in the best position to move forward.
While we certainly hope you believe a union is unnecessary and you will vote no, we need this matter behind us on Friday. We have all learned a lot about ourselves and our plant through this union campaign. Regardless of your position on this matter, we all need to put as much effort into working together on our plant as we have in addressing the union election.
J.A. 640. The content of the flyer is not alleged to be coercive or otherwise violative of the Act.

. Specifically, the Board found that the supervisors' leafleting became coercive surveillance merely because:
The presence of supervisors at the plant gate where employees arrived and left was itself unusual. Further, management officials typically communicated with employees in meetings, and there was no evidence that, prior to the campaign, it had leafleted its own employees. As the [ALJ] found, the Respondent's supervisors could see not only the employees distributing leaflets, but also which employees accepted or rejected the leaflets, and any interactions between them.
J.A. 679 (citations omitted).