# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued October 13, 2023          Decided March 1, 2024

No. 22-1332

NCRNC, LLC, D/B/A NORTHEAST CENTER FOR
REHABILITATION AND BRAIN INJURY,
PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

1199SEIU UNITED HEALTHCARE WORKERS EAST,
INTERVENOR

———

Consolidated with 23-1023

———

On Petition for Review and Cross-Application
for Enforcement of an Order
of the National Labor Relations Board

———

*Dawn J. Lanouette* argued the cause for petitioner. With
her on the briefs was *James S. Gleason*.

*Eric Weitz*, Attorney, National Labor Relations Board, argued the cause for respondent. With him on the brief were *Jennifer A. Abruzzo*, General Counsel, *Ruth E. Burdick*, Deputy Associate General Counsel, *David Habenstreit*, Assistant General Counsel, and *Kira Dellinger Vol*, Supervisory Attorney.

Before: KATSAS and RAO, *Circuit Judges*, and GINSBURG, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* RAO.

RAO, *Circuit Judge*: This case involves a challenge to a National Labor Relations Board decision finding several unfair labor practices against NCRNC, LLC, which operates the Northeast Center for Rehabilitation and Brain Injury ("Northeast"). We deny the petition for review and grant the Board's cross-petition for enforcement, summarily affirming the Board's conclusions with one exception. The Board erred in finding that unlawful surveillance was supported by Northeast's distribution of flyers to its employees. In these circumstances, sharing informational flyers was an exercise of free speech protected by Section 8(c) of the National Labor Relations Act ("NLRA"). Other facts in the record, however, provide substantial evidence to uphold the finding of unlawful surveillance, and we grant enforcement on these more limited grounds.

I.

In the agency proceedings, the facts and the credibility of witnesses were sharply contested. The administrative law judge ("ALJ") generally found the testimony of the Board's witnesses more credible than testimony from Northeast's witnesses, and the Board adopted the ALJ's determinations.

*NCRNC, LLC*, 372 NLRB No. 35, at *1 (Dec. 16, 2022). In its petition for review, Northeast did not contest these credibility determinations. *See* Tr. of Oral Arg. at 6–8 (counsel confirming that Northeast did not challenge the Board's credibility determinations, only the "legal conclusion" that Northeast "interfer[ed] with union activity"). Accordingly, we present the facts as found by the Board.

Northeast is a rehabilitation facility for patients recovering from brain injuries. In June 2019, 1199SEIU United Healthcare Workers East ("Union") began a campaign to organize Northeast's employees, holding meetings outside of work and soliciting authorization cards. Northeast's leadership became aware of the unionization effort and hired Keith Peraino, a labor relations consultant, to assist with the administration's response and to "get ahead of the union talk." Peraino interviewed managers and staff to evaluate facility conditions and trained managers on legal responses to the union campaign.

The unionization drive continued through the summer, and, in October, the Union petitioned the Board for a representation election. After the petition was filed, Peraino began holding twice-daily meetings with the managers. At the morning meetings, the managers were asked to distribute informational "fact of the day" flyers, which included quotes from a guide to the NLRA, and get employee feedback. At the afternoon meetings, the managers relayed that feedback and noted whether any employees showed interest in the topics or had questions. Managers also reported employees' body language and attitudes toward the flyers, including whether employees made eye contact, reacted in other ways, like crumpling the flyers, or spoke to anyone else after talking with a manager.

Around the same time, Northeast's leadership implemented a "Manager on Duty" program, in which managers would rotate around different floors and purportedly assist staff.[1] Yet Tara Golden, a manager, testified that managers were not required to assist staff. Rather, they were directed to observe if employees gathered in groups, to report behavior around management, and to monitor "suspicious activities."

Employees found the heightened presence of managers at the facility unusual. One nurse, Kelly Leonard, testified the managers' behavior was odd: they just "[stood] by the time clock" or walked around talking to employees without being able to assist with patient care. Golden similarly testified that managers who "didn't belong on the units" were talking to staff. She said employees characterized the increased activity as a "witch hunt" for Union supporters. When Golden raised concerns with her supervisors, she was informed that Northeast was "trying to figure out who was for the Union and who wasn't." Golden was subsequently fired.

The Union filed several unfair labor practice charges. Golden filed a separate unfair labor practice charge, which was consolidated with the Union's complaint.

The Board's General Counsel issued a complaint against Northeast. After a hearing, the ALJ found that Northeast

---

[1] Northeast argues this program began in August as part of Peraino's initial recommendations, but the Board credited testimony indicating the program started in October. *NCRNC, LLC*, 372 NLRB No. 35, at *3. Northeast points to record evidence that Patrick Weir, the highest-ranking official at Northeast, increased his visibility at the facility in July, as part of a "union avoidance" effort. That evidence, however, does not overcome the Board's evidence that the more comprehensive Manager on Duty program was instituted in October.

violated Section 8(a)(1) and (3) of the NLRA by discharging two employees for their union activity. *See* National Labor Relations Act, Pub. L. No. 74-198, 49 Stat. 449, 452 (1935) (codified as amended at 29 U.S.C. § 158(a)(1), (3)). The ALJ found additional violations of Section 8(a)(1) for, among other things, unlawfully surveilling and interrogating employees and dismissing Golden for her refusal to surveil employees. The Board largely adopted the ALJ's findings and affirmed. *NCRNC, LLC*, 372 NLRB No. 35, at *1–2. Member Ring dissented on several issues. As relevant here, he maintained that Northeast's activity did not constitute unlawful surveillance because the distribution of literature to its employees was protected free speech activity under Section 8(c) of the NLRA. *Id.* at *13–17 (Ring, dissenting in part); *see also* 29 U.S.C. § 158(c).

Northeast petitions for review and the Board cross-petitions for enforcement. We have jurisdiction under 29 U.S.C. § 160(e), (f).

II.

On a petition for review, we "must evaluate both the Board's statements of law and application of law to the facts." *Circus Circus Casinos, Inc. v. NLRB*, 961 F.3d 469, 475 (D.C. Cir. 2020). The Board's findings must be supported by substantial evidence, which is such evidence that "a reasonable mind might accept … as adequate to support a conclusion." *Id.* at 484 (cleaned up). We will vacate the Board's decision if "the Board acted arbitrarily or otherwise erred in applying established law to the facts of the case." *Fred Meyer Stores, Inc. v. NLRB*, 865 F.3d 630, 638 (D.C. Cir. 2017) (cleaned up). "[R]eviewing courts are not to abdicate the conventional judicial function because Congress has imposed on them responsibility for assuring that the Board keeps within

reasonable grounds." *Circus Circus Casinos*, 961 F.3d at 475 (cleaned up).

Substantial evidence supports the Board's determinations that Northeast violated Section 8(a)(1) and (3) when it suspended and discharged two employees for their union activities, one of whom it also threatened and coercively interrogated. Northeast also violated Section 8(a)(1) by discharging Golden for refusing to commit unlawful surveillance. Therefore, we summarily grant enforcement on these claims for the reasons stated in the Board's order.[2]

### III.

The Board also determined Northeast unlawfully surveilled employees. It is well established that an employer violates Section 8(a)(1) by engaging in or creating an impression of surveillance because such conduct "interfere[s] with, restrain[s], or coerce[s] employees" attempting to exercise their right to self-organization and collective bargaining. *See Parsippany Hotel Mgmt. Co. v. NLRB*, 99 F.3d 413, 420 (D.C. Cir. 1996) (quoting 29 U.S.C. § 158(a)(1)). Employers cannot engage in conduct "so out of the ordinary that it creates the impression of surveillance." *Id.* (cleaned up). Routine employer observation of employees who may be engaged in union activity, however, is not illegal. "If a union wishes to organize in public it cannot demand that management

---

[2] Northeast does not challenge the Board's determinations that it violated Section 8(a)(1) on the following charges: threatening to report a nurse to the state nursing authority in retaliation for her union activity; creating the impression of surveillance; and posting a memorandum blaming the Union for Northeast's decision to institute a wage freeze. The Board is entitled to summary enforcement on these violations. *See, e.g.*, *Flying Food Grp., Inc. v. NLRB*, 471 F.3d 178, 181 (D.C. Cir. 2006).

must hide." *The Broadway*, 267 NLRB 385, 400 (1983); *see also Parsippany Hotel*, 99 F.3d at 420 ("Th[e] prohibition against surveillance does not prevent employers from observing public union activity.") (cleaned up). An employer's actions are unlawful only when they have a "reasonable tendency in the totality of the circumstances to intimidate the employees." *Intertape Polymer Corp. v. NLRB*, 801 F.3d 224, 236 (4th Cir. 2015) (cleaned up).

In assessing the totality of the circumstances to find unlawful surveillance, the Board relied in part on Northeast's distribution of flyers and observation of employee reactions. As a matter of law, however, these actions cannot support a finding of unlawful surveillance because the flyers were a protected exercise of Northeast's free speech rights under Section 8(c) of the NLRA. Nevertheless, the Board's other findings provide substantial evidence that Northeast unlawfully surveilled its employees, and we enforce the Board's decision on these grounds.[3]

---

[3] Northeast also raises a due process objection. The original complaint alleged Northeast created an unlawful *impression* of surveillance, unlawfully instructed managers to surveil employees, and unlawfully discharged a supervisor for refusing to surveil employees, but the complaint did not allege that Northeast unlawfully surveilled its employees. The ALJ sua sponte found an unlawful surveillance violation, which the Board upheld. *See NCRNC, LLC*, 372 NLRB No. 35, at *6 n.21. Northeast claims it did not have an opportunity to present a complete defense against this charge. This argument fails because the unlawful surveillance violation was "closely connected to the subject matter of the complaint and [was] fully litigated." *Bellagio, LLC v. NLRB*, 854 F.3d 703, 712 (D.C. Cir. 2017) (cleaned up).

8

A.

The Board found Northeast engaged in unlawful surveillance in part because managers distributed flyers and sought to "gain information about the union sentiments of its employees by observing their body language [and] reactions to leafletting." *NCRNC, LLC*, 372 NLRB No. 35, at *7. Because handing out flyers "reasonably cause[d] employees to reveal … clues about their union support," the Board analogized Northeast's flyering campaign to unlawful interrogation that "in certain circumstances … has a reasonable tendency to 'interfere with, restrain, or coerce' employees in their exercise of statutory rights." *Id.* at *7 & n.23 (cleaned up).

Distributing informational flyers and observing employee reactions, however, do not constitute unlawful surveillance. When a manager shares a flyer with an employee and engages in non-coercive "one-on-one persuasion," that is protected speech under the NLRA. *See id.* at *17 (Ring, dissenting in part). Section 8(c) provides that: "The expressing of any views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice" unless it contains a "threat of reprisal or force or promise of benefit." 29 U.S.C. § 158(c). The Supreme Court has emphasized that Section 8(c) recognizes important First Amendment rights and "precludes regulation of [noncoercive] speech about unionization." *Chamber of Commerce v. Brown*, 554 U.S. 60, 67–68 (2008). And we have recognized that "an employer's free speech right to communicate his views to his employees is firmly established and cannot be infringed by … the Board." *See Crown Cork & Seal Co. v. NLRB*, 36 F.3d 1130, 1140 (D.C. Cir. 1994) (quoting *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 617 (1969)); *see also Cadillac of Naperville, Inc. v. NLRB*, 14 F.4th 703, 723 (D.C. Cir. 2021) (Katsas, J., concurring in part

and dissenting in part) (observing that in labor disputes, there should be a presumption "in favor of speech rather than against it"). In short, we favor "uninhibited, robust, and wide-open debate in labor disputes." *Old Dominion Branch No. 496, Nat'l Ass'n of Letter Carriers v. Austin*, 418 U.S. 264, 273 (1974).

Here, Northeast's persuasion efforts were protected speech under Section 8(c). The NLRB has long recognized that employers are "explicitly accorded a right to 'influence' [their] employees by verbal appeals to reason." *Standard-Coosa-Thatcher Co.*, 85 NLRB 1358, 1363 (1949); *cf. Intertape Polymer*, 801 F.3d at 240 (holding that "even if … leaflet[t]ing is construed as 'out of the ordinary,' [that] is plainly insufficient to establish … coercion"). Northeast's supervisors instructed managers to distribute flyers, discuss the content with employees, note their reactions and responses, and report back. These actions were lawful because "an employer is free to communicate to his employees any of his general views about unionism." *Gissel Packing*, 395 U.S. at 618.

Of course, Section 8(c) does not protect the "threat of reprisal or force or promise of benefit." 29 U.S.C. § 158(c). We have, for instance, upheld a finding of unlawful surveillance after an interrogation in which managers explicitly accused employees of supporting a union and asked them who was "'behind' the Union." *Gold Coast Rest. Corp v. NLRB*, 995 F.2d 257, 266 (D.C. Cir. 1993); *see also Allegheny Ludlum Corp.*, 333 NLRB 734, 745–46 (2001), *enfd.*, 301 F.3d 167 (3d Cir. 2002) (finding unlawful polling when employees were solicited to appear in an anti-union film). Northeast's actions, however, are not the equivalent of unlawful interrogation or polling. *See NCRNC, LLC*, 372 NLRB No. 35, at *17 (Ring, dissenting in part). The flyers simply included language from a guide to the NLRA, which the record indicates is published by the Board on its website. The Board does not suggest managers

threatened or questioned employees about improper topics when distributing the flyers. *See id.* at \*3–4. Managers merely observed employee reactions to the flyers and conversations about unionization. We agree with Member Ring that such observations cannot reasonably constitute a threat nor create a reasonable impression that the employer is trying to inhibit union activity. *Id.* at \*17 (Ring, dissenting in part). The employees were not asked to say or do anything that would reveal their views, and management observed only what is inevitably witnessed in any personal encounter. Unlawful surveillance cannot be defined as broadly as the Board's decision suggests because one-on-one persuasion efforts are protected by Section 8(c) in the absence of any coercion or threats.

Nor did the Board proffer any evidence that Northeast's efforts at one-on-one persuasion had a "reasonable tendency" to "intimidate" employees. *See Intertape Polymer*, 801 F.3d at 236 (cleaned up); *see also Greater Omaha Packing Co. v. NLRB*, 790 F.3d 816, 823 (8th Cir. 2015) (holding that the Board cannot "ignore [the] critical coercion element" in an unlawful surveillance case). Employers may investigate employees' views on unionization so long as employers use non-coercive means to discover those views. "[R]equiring supervisors to report what they see and hear in the normal course of their day … is not illegal." *NCRNC, LLC*, 372 NLRB No. 35, at \*14 (Ring, dissenting in part) (cleaned up). Holding otherwise would prevent an employer from discussing its perspective on unionization with employees in violation of Section 8(c).

In sum, Northeast's distribution of flyers and one-on-one persuasion efforts were protected by Section 8(c), and therefore the Board erred in determining that these actions contributed to a finding of unlawful surveillance.

B.

The Board also concluded Northeast engaged in unlawful surveillance by implementing its Manager on Duty program. Primarily relying on the testimony of Golden and Leonard, the Board determined the increased presence of managers in the facility during the union drive, at abnormal times and locations, was "atypical monitoring." *Id.* at \*6–7. The Board found this monitoring had "no legitimate business purpose unrelated to employees' [unionization] activity, and it had a reasonable tendency to chill" protected activity in violation of Section 8(a)(1). *Id.* at \*7. In light of the unchallenged credibility findings, we hold the Board's decision was supported by substantial evidence.

A finding of unlawful surveillance requires employer conduct that is objectively "so out of the ordinary that it creates the impression of surveillance." *Parsippany Hotel*, 99 F.3d at 420 (cleaned up). The Board must consider "the duration of the observation, the employer's distance from its employees while observing them, and whether the employer engaged in other coercive behavior during its observation." *Bellagio, LLC v. NLRB*, 854 F.3d 703, 711 (D.C. Cir. 2017) (cleaned up). The key is the "employer's reason for being in a particular place at a particular time." *Intertape Polymer*, 801 F.3d at 239.

Under our caselaw, unlawful surveillance occurs when there are unexplained and unjustified changes in the visibility of management and observation of employees. *Compare Parsippany Hotel*, 99 F.3d at 419–20 (upholding unlawful surveillance, when, in the lead-up to a union election, the employer increased security, and numerous employees testified about the pernicious effect of the increased observation), *with Bellagio*, 854 F.3d at 711–12 (rejecting the Board's finding of unlawful surveillance when a supervisor briefly observed and

followed an employee in a well-trafficked area during the supervisor's regular job duties); *accord Sprain Brook Manor Nursing Home, LLC*, 351 NLRB 1190, 1190–91 (2007) (finding unlawful surveillance when a supervisor went to the facility on the weekend to observe union activity and stood by the exit door to monitor employees).

In determining whether the Board's findings are supported by substantial evidence, our review here is particularly limited because Northeast's petition does not challenge the Board's credibility determinations regarding Golden and Leonard. Based on their testimony, after the Manager on Duty program began in October, managers came in during off-shifts to monitor the employees and look for "suspicious activities" to uncover which employees were "for the Union."[4]

Relying on the unchallenged record before us, the behavior of management during the union drive represented a significant departure from prior practice. Only during the union drive were managers and supervisors present in the facility at unusual times and locations. And only during the organizing effort did management watch staff in conspicuous locations, such as by the time clock, for extended periods. Furthermore, Northeast's leadership admitted the program's purpose was to uncover employees' union sentiments.[5] This evidence is sufficient for a

---

[4] The ALJ did not credit Northeast's witnesses who testified that the Manager on Duty program was enacted solely in response to employee concerns about manager visibility. The Board affirmed these determinations and Northeast does not challenge them in its petition.

[5] Northeast also maintains that, as a healthcare facility, its managers have continuous responsibility for their staff and could always be ordered to work at different times. But the fact that Northeast could legitimately increase management supervision does not address

reasonable person to find the Manager on Duty program deviated from the company's usual practices and was enacted solely to inhibit employees from participating in protected union organizing activities.

\* \* \*

Section 8(c) of the National Labor Relations Act protects freedom of speech in labor disputes. Northeast's persuasion efforts and distribution of flyers to employees were protected free speech activity. The Board therefore erred in concluding that such activity supported a finding of unlawful surveillance. Northeast's program of increased manager visibility and observation, however, independently provided substantial evidence to support the finding. We therefore grant the Board's cross-petition for enforcement and deny Northeast's petition for review.

*So ordered.*

---

whether the Manager on Duty program constituted unlawful surveillance in these circumstances.