**NEW RIVER INDUSTRIES, INCORPORATED,**
Petitioner,

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**NEW RIVER INDUSTRIES, INCORPORATED,**
Respondent,

v.

**NATIONAL LABOR RELATIONS BOARD, Petitioner.**

**Nos. 90–3173, 90–3181.**

United States Court of Appeals, Fourth Circuit.

Argued May 9, 1991.

Decided Oct. 4, 1991.

As Amended Oct. 24, 1991.

James Hamilton Stewart, III, Ogletree, Deakins, Nash, Smoak and Stewart, Greenville, S.C., argued (Jack C. Clary, on brief), for petitioner New River Industries, Inc.

John Duncan Burgoyne, Asst. Gen. Counsel, N.L.R.B., Washington, D.C., argued (Jerry M. Hunter, Gen. Counsel, D. Randall Frye, Acting Deputy Gen. Counsel, Aileen A. Armstrong, Deputy Associate Gen. Counsel, on brief), for respondent.

Before WIDENER and NIEMEYER, Circuit Judges, and MURRAY, Senior District Judge for the District of Maryland, sitting by designation.

### OPINION

NIEMEYER, Circuit Judge:

Edward Smith and Jeanie Simpson were terminated from their employment with New River Industries, Inc. on November 15, 1988, for collaborating in the preparation and posting of a mocking and sarcastic letter that was critical of New River. After a charge of unfair labor practice was filed, the National Labor Relations Board (NLRB) found that New River had violated § 8(a)(1) and (3) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1), (3) (1988), by discharging Smith and Simpson for engaging in "concerted activity" and in "perceived union activity." For the reasons that follow, we grant New River's petition for review, and deny the NLRB's cross-application for enforcement of its order.

### I

New River Industries, Inc. manufactures acetate fiber products, such as suit linings, bridal satins, casket linings, and coat hanger covers, at a plant in Radford, Virginia. In 1988, after months of negotiations, New River reached an agreement with Hoechst–Celanese Textile Fibers Group under which Hoechst was to become New River's sole supplier of acetate fiber yarn. The agreement was significant to New River because it meant that Hoechst would participate in quality control functions and assure New River a reliable source. Rather than testing every shipment of acetate yarn, New River would routinely accept shipments as meeting agreed-upon standards, performing only periodic audit tests to insure quality control.

To celebrate the agreement with Hoechst, which was the first such arrangement ever reached by New River, New River displayed banners in the plant and gave each employee a memento pocket flashlight bearing the inscription "NRI–Hoechst Celanese." On October 28, 1988, notices were posted on bulletin boards throughout the plant extolling the benefits of the new relationship with Hoechst, announcing the formal signing date of the agreement, and stating, "In recognition of this certification [of Hoechst as a supplier], some type of refreshment will be served to our employees on their respective shifts November 9th and 10th." On November 9th and 10th, New River issued a ticket to each employee redeemable in the lunchroom for a free ice cream cone.

Several employees, including Edward Smith, voiced some ridicule of the free ice cream cones. One employee suggested writing a letter to "thank" the company for its generosity, and Smith undertook to write the letter. After preparing a handwritten draft, he took the letter to Jeanie Simpson and asked for her assistance in typing it. She read the draft, laughed, and agreed to type it because "it expressed how the employees really felt about things." The letter read:

The employees of New River would like to express their great appreciation of the 52 flavors of left over ice cream from the closed Meadow Gold Plant. It has boosted moral [sic] tremendously. Several employees were heard to say they were going to work harder together, and do better so we could have some more old ice cream.

We realize what a tremendous sacrifice this has been for the management and will be long remembered. We hope this has not cut into computer expenses.

Many feel this almost out does the company picnic[sic] this sumner [sic]. We are also glad the Milliken employees enjoyed this immensely. They said they have never seen employees treated like this. We sincerely appreciate all the sacrifices management has made for us and anticipate the Thanksgiving and Christmas, New Year Employee Appreciation Day combination dinner.

There had been no picnic that summer, nor employee appreciation dinners for some time.

Smith posted the letter on an open bulletin board on Thursday evening, November

10, 1988. On returning to work on Friday, the next day, he discovered that the letter had been removed so he posted another copy that morning. Another copy was discovered by management later that day in a locked bulletin board. Both of these letters were also removed. On Monday, November 14, another copy of the letter was again discovered in the locked bulletin board. This copy had a handwritten notation at the bottom that read, "United NRI Workers Vote Union on January 1."

On Friday morning, November 11, a maintenance supervisor brought a copy of the letter to Larry Maust, the vice president of manufacturing, who was upset and angered by the letter. He testified that the Hoechst people, who were regularly in the plant, would take offense, as would outside consultants who were former Milliken employees. On the same day, Maust discussed the matter with the personnel director, Billy Bryant, and then with the chief financial officer, Jim Lawrence, and the administrative manager, Bob Cullaty. Maust and Bryant agreed that the person or persons responsible, who were not then known, should be terminated.[1]

On Friday afternoon, after the clerical help had departed, Cullaty discovered that the typewriter in the supply room was used to type the letter because the message was still on the carbon ribbon.

On Tuesday, November 15, Cullaty pressed his investigation further and confronted Gary Sutphin, a supervisor-trainee with access to the supply room, about the letter, but Sutphin denied any involvement or knowledge of its preparation. When Cullaty and Lawrence questioned Jeanie Simpson, who also worked in the supply room, she admitted typing the letter. At first she denied that anyone else was in-

volved, but after she was advised that her chances for a promotion were in jeopardy, she implicated Edward Smith. She testified that Cullaty also questioned her about the handwritten notation to "vote union," about which she testified she knew nothing. New River denies that Cullaty asked her about the handwritten notation. After the questioning, Simpson returned to her duties.

Later that morning, Simpson was recalled to Cullaty's office, where she was told that she was being terminated pursuant to Plant Rule 4.[2] A contemporaneous New River record indicates that Simpson was fired for

> gross violation of Plant Rules, particularly # 4, which included typing a notice that was then posted on a locked bulletin board. The notice was unauthorized, was disrupting to the work force and was derogatory and undermining to management and fellow employees.

At the time of her discharge, Simpson had worked at New River for 15 years without any infraction or reprimand, and Maust had considered her to be a good employee.

Smith, who had the day off on Tuesday, November 15, was called in to be questioned. When he was confronted with the letter by Cullaty and Lawrence, he admitted authoring it. He also stated that "he pretty much did it himself." Smith denied putting any copies of the letter in the locked bulletin board or writing the notation to "vote union." New River again contends that no mention was made of the word "union" during the interrogation of Smith. Smith was also discharged pursuant to Plant Rule 4, and the New River record of the termination provides:

> Eddie wrote a notice (or Letter) and posted it on the Bulletin Board. The notice

---

**1.** While the ALJ does not discredit the testimony that the decision to terminate was made on Friday, November 11, he does find that the reasons given were a pretext. Likewise, the NLRB, in its recitation of facts, agrees that the decision was made then. NLRB Brief at 7.

**2.** Plant Rule 4 provides:

Consideration of the rights of co-workers requires that employees conduct themselves in a respectable and orderly manner. Fighting, in-

juring other individuals, sexual harassment, insubordination, or using abusive or threatening language directed towards superiors, co-workers or other individuals is not to be tolerated. This is also inclusive of "horse-play" and any other objectionable, unsafe, illegal, dishonest, or fraudulent acts. Violation constitutes a basis for disciplinary action, including immediate termination.

was disruptive to the workforce—it was undermining to management and fellow workers. It contained untruths or half truths and a bulletin board was broken into to post the notice. Violation of plant rule # 4.

At the time of his discharge, Smith had ten years of service with New River. Like Simpson, he was considered a good employee, although on one previous occasion he had been counselled by Cullaty for being inattentive to his duties and for writing a false work order.

Shortly thereafter Simpson filed a charge of unfair labor practice with the NLRB against New River based on New River's discharge of her and Smith. The case was referred to an administrative law judge (ALJ), who found that Smith and Simpson "were discharged for union activity in violation of Section 8(a)(1) and (3) of the [National Labor Relations] Act and for other concerted activities in violation of Section 8(a)(1)." The ALJ recommended an order that called for New River to reinstate Smith and Simpson with back pay. A three-member panel of the NLRB affirmed the ALJ. Only two members, however, agreed with the ALJ's conclusion that New River fired Smith and Simpson because New River "mistakenly believed they had engaged in union activities." The remaining member of the panel agreed that Smith and Simpson were discharged for concerted activities in violation of section 8(a)(1) and therefore did not find it necessary to rule on the issue of whether they were engaged in perceived union activity, which formed the basis for the conclusion that New River violated § 8(a)(3) of the Act.

New River has filed a petition for review of the NLRB order and seeks to have it set aside, and the NLRB has filed a cross-application for enforcement.

## II

Section 8(a)(1) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1) (1988), provides:

It shall be an unfair labor practice for an employer—(1) to interfere with, restrain, or coerce employees in the exer-

cise of the rights guaranteed in section 157 of this title....

The pertinent right, guaranteed to employees by section 157, is the right "to engage in ... concerted activities for the purpose of collective bargaining or other mutual aid or protection...." 29 U.S.C. § 157 (1988). The General Counsel contends that Smith and Simpson had engaged in "concerted activity" within the meaning of the Act by writing the mocking letter about the free ice cream.

■ Although "concerted activity" is not expressly defined in the Act, the term "clearly enough embraces the activities of employees who have joined together in order to achieve common goals." *NLRB v. City Disposal Systems, Inc.*, 465 U.S. 822, 830, 104 S.Ct. 1505, 1510–11, 79 L.Ed.2d 839 (1984). That Smith and Simpson collaborated on the letter and worked "in concert" with each other cannot be seriously disputed. But the fact that Smith and Simpson worked together in preparing the letter is not sufficient by itself to show that they engaged in that concerted activity which is protected by the Act.

■ Section 7 of the NLRA provides that an activity, to be protected, must be "for the purpose of collective bargaining or other mutual aid or protection." 29 U.S.C. § 157. The "mutual aid or protection" clause of Section 7 protects employees who "seek to improve terms and conditions of employment or otherwise improve their lot as employees through channels outside the immediate employee-employer relationship." *Eastex, Inc. v. NLRB*, 437 U.S. 556, 565, 98 S.Ct. 2505, 2512, 57 L.Ed.2d 428 (1978).

■ The conditions of employment which employees may seek to improve are sufficiently well identified to include wages, benefits, working hours, the physical environment, dress codes, assignments, responsibilities, and the like. The expression of criticism about management or, in this case, the value of a one-time gift or expression of appreciation from management is not a condition of employment that employees have a protected right to seek to im-

prove. When employees collaborate to criticize matters that are not related to the mutual aid or protection of the employees, this activity is not protected "concerted activity." *See, e.g., NLRB v. Local 1229, Int'l Bhd. of Elec. Workers*, 346 U.S. 464, 476–77, 74 S.Ct. 172, 178–79, 98 L.Ed. 195 (1953) (circulating handbills that attacked the quality of employer's television broadcasts not protected); *Joanna Cotton Mills Co. v. NLRB*, 176 F.2d 749, 751–53 (4th Cir.1949) (circulating petition that called for resignation of foreman who imposed discipline not protected); *cf. Community Hosp. of Roanoke Valley, Inc. v. NLRB*, 538 F.2d 607, 610 (4th Cir.1976) (public criticism, expressed in letter and television interview, of *working conditions* for nurses at hospital held to be protected concerted activity).

■ Accordingly, we conclude that the actions of Smith and Simpson in preparing a mocking letter about free ice cream supplied in appreciation for a new contract with a supplier are not protected concerted activities. The letter was not intended to "enlist the support and assistance of other employees for the purpose of correcting what the workers thought to be an inadequacy in working conditions." *Owens Corning Fiberglas Corp. v. NLRB*, 407 F.2d 1357, 1365 (4th Cir.1969). Rather, the letter was simply intended as a satirical comment on the way management of New River chose to say "thank you."

Undoubtedly criticisms of working conditions by satiric letters or other conduct can be protected activity. But the letter in this case was prepared as a lark, initiated by an employee, Smith, who had instigated a number of "jokes" before, for the sole purpose of belittling the company's gesture. While perhaps revealing the general morale of the employees, the letter was not a medium intended to resolve or call attention to conditions of employment. *See NLRB v. Local 1229*, 346 U.S. at 476, 74 S.Ct. at 178–79; *Joanna Cotton Mills*, 176

F.2d at 753. The letter was thus unlike the letter and the interview which were at issue in *Community Hosp.*, 538 F.2d at 608–09, where two nurses openly criticized their salaries, benefits, duties, and working hours at a hospital. While Smith and Simpson may have desired a more expensive gesture of gratitude by management, expressing a longing for dearer appreciation by one's employer is no more protected concerted activity than was the expressed resentment to a supervisor's rebuke in *Joanna Cotton Mills*.

The firing of two otherwise capable employees for writing a mocking letter may have been an unduly harsh response by New River. That reaction perhaps reflects an unseemly hypersensitivity to satire rather than a reasonable response to an act of disloyalty and disrespect. Nevertheless, we find that the NLRB erred in concluding that Smith and Simpson had engaged in protected concerted activity by preparing the letter.

### III

We turn now to review of the NLRB's conclusion (as reflected by the vote of two members of the panel) that New River violated § 8(a)(1) and (3) of the NLRA, 29 U.S.C. § 158(a)(1), (3),[3] when it discharged Smith and Simpson for engaging in "perceived" union activity.

■ To prove that an employer who discharged an employee violated § 8(a)(1) and (3) for engaging in perceived union activity, the NLRB has the burden "to prove that employer opposition to union activity was a motivating factor in the employer's decision to fire [the] employee." *Salem Leasing Corp. v. NLRB*, 774 F.2d 85, 87 (4th Cir.1985). In making this showing, it is immaterial that the employee was not in fact engaging in union activity, so long as that was the perception and therefore a motivating factor. *See NLRB v. Nueva Engineering, Inc.*, 761 F.2d 961,

---

**3.** Section 8(a)(3) provides that it is an unfair labor practice for an employer to encourage or discourage membership in a labor organization "by discrimination in regard to hire or tenure of employment or any term or condition of em-

ployment." 29 U.S.C. § 158(a)(3). A violation of § 8(a)(3) of the Act involves a derivative violation of § 8(a)(1). *Metropolitan Edison Co. v. NLRB*, 460 U.S. 693, 698 n. 4, 103 S.Ct. 1467, 1472 n. 4, 75 L.Ed.2d 387 (1983).

967 (4th Cir.1985) (employer surveillance of what employer mistakenly thought to be union meeting violated § 8(a)(1)). If the NLRB makes the showing, the burden shifts to the employer to show by a preponderance of the evidence that it would have taken the adverse action regardless of the perceived union activity. *Salem Leasing Corp.*, 774 F.2d at 87. In the end, if the NLRB's findings of fact are substantially supported by the record as a whole, the inquiry ends and the NLRB's order must be enforced, even if we would have reached a different conclusion. *NLRB v. General Wood Preserving Co.*, 905 F.2d 803, 810 (4th Cir.), *cert. denied,* — U.S. —, 111 S.Ct. 590, 112 L.Ed.2d 595 (1990).

██ In this case, the NLRB's findings of fact, as expressed by the ALJ, are not substantially supported by the record as a whole. Although the ALJ found that "the hope [by New River] of stifling an incipient drive for unionization did indeed play a significant role in the decision to fire the two employees," the record shows that there had been no union activity at the plant for about eight years, and as of Friday, November 11, 1988, when Maust and Bryant determined to discharge the employee or employees responsible for the letter, no "vote union" message had yet appeared. The copy of the letter placed in the locked bulletin board with the notation to "vote union" did not appear until Monday morning, November 14. Even the NLRB concedes in its brief, Maust and Bryant had already decided on Friday, November 11, 1988, to discharge the persons responsible for the letter. NLRB Brief at 7. Thus, the decision to discipline Smith and Simpson for the letter was not even in the context of union activity. It is true that at the time when the decision was implemented, the note "vote union" had appeared on the bulletin board, but that was after the fact.[4] The decision had been made without the note possibly serving as

a motivating factor. Therefore, the NLRB conclusion, as reflected by the vote of two panel members, that New River violated § 8(a)(1) and (3) is unsupported by the evidence.

For the reasons given, we grant New River's petition for review and deny the cross-application of the NLRB to enforce the order.

IT IS SO ORDERED.

4. Yet, the ALJ concluded that New River's desire to stifle a new drive for unionization played "a significant role in the decision to fire the two employees" based on New River's one-day delay in interviewing employees while investigating the letter's source and on the fact that the interviews occurred after the appearance of the "vote union" message. The ALJ never accounted for the testimony that the decision to fire was made on the previous Friday.