**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 22-1366**

---

NATIONAL LABOR RELATIONS BOARD,

Petitioner,

v.

PAIN RELIEF CENTERS P.A.,

Respondent.

---

**No. 22-1582**

---

PAIN RELIEF CENTERS P.A.,

Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD,

Respondent.

---

On Application for Enforcement of an Order of the National Labor Relations Board and Cross-Petition for Review. (10-CA-260563)

---

Submitted: April 25, 2023                Decided: August 22, 2023

Before WILKINSON, HARRIS, and RICHARDSON, Circuit Judges.

_____

Application for enforcement granted and cross-petition for review denied by unpublished opinion.  Judge Harris wrote the majority opinion, in which Judge Wilkinson joined.  Judge Wilkinson wrote a concurring opinion.  Judge Richardson wrote an opinion dissenting in part and concurring in part.

_____

**ON BRIEF:**  Kira Dellinger Vol, Supervisory Attorney, Jennifer A. Abruzzo, General Counsel, Peter Sung Ohr, Deputy General Counsel, Ruth E. Burdick, Deputy Associate General Counsel, David Habenstreit, Assistant General Counsel, Eric Weitz, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for Petitioner/Cross-Respondent. Matthew Kyle Rogers, LAW OFFICES OF MATTHEW K. ROGERS, PLLC, Hickory, North Carolina, for Respondent/Cross-Petitioner.

_____

Unpublished opinions are not binding precedent in this circuit.

PAMELA HARRIS, Circuit Judge:

Five employees of a pain-management clinic were fired after they complained about their treatment by the practice manager and ultimately walked off the job. An administrative law judge found that the employer had engaged in two unfair labor practices prohibited by the National Labor Relations Act: coercively questioning the employees about their complaints, and then firing them for participating in the walkout. The National Labor Relations Board affirmed and ordered relief. The Board has now filed an application for enforcement of its order, and the employer has filed a cross-petition for review. Substantially for the reasons given by the administrative law judge and the Board, we grant the Board's application and deny the employer's petition.

## I.

## A.

Section 7 of the National Labor Relations Act ("Act") codifies the right of employees "to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection[.]" 29 U.S.C. § 157. To protect these rights, Section 8 of the Act proscribes "unfair labor practice[s]," which it defines in relevant part as "interfer[ing] with, restrain[ing], or coerc[ing] employees in the exercise of" their Section 7 rights. 29 U.S.C. § 158(a)(1). The Act also "empower[s]" the National Labor Relations Board ("Board" or "NLRB") "to prevent any person from engaging in any unfair labor practice" and, upon

3

finding a violation of the Act, "to take such affirmative action . . . as will effectuate the policies of" the Act, including ordering remedies like reinstatement and backpay. 29 U.S.C. § 160(a), (c).

**B.**

Pain Relief Centers, P.A. ("PRC"), respondent to the application for enforcement and cross-petitioner for review, operates two medical clinics providing pain-management and addiction-treatment services in North Carolina.[1]  At the relevant time, PRC was owned and operated by Hans Hansen, who was the sole medical doctor at the clinics.  Sharese Cromer, variously termed the "practice manager" or "office manager," performed a wide range of administrative and supervisory functions.

The events giving rise to this case took place at PRC's Conover, North Carolina, location.  Krisandra Edwards, a nurse practitioner, was one of the medical providers at the Conover clinic.  The clinic also employed medical assistants to support its medical providers, and Miranda Cox, Erin Stiltner, Yesenia Ramirez-Zavala, and Amber Whitlock worked at the clinic in that capacity.

For months in the spring of 2020, there was "growing frustration with Cromer's treatment of the staff in managing the Conover office."  Administrative Law Judge ("ALJ")

---

[1] Most of the facts recounted here are undisputed.  Where there is a dispute, we note the disagreement and describe the version of events credited by the administrative law judge.

4

Decision at 7.[2]  The medical assistants found Cromer "belittling, disrespectful, and bullying," *id.* at 8 (cleaned up), and felt their jobs were threatened by her.  The medical assistants shared their concerns with nurse practitioner Edwards, and the employees discussed their complaints as a group.

Matters came to a head in May of 2020, with two key incidents that became the basis of the instant NLRB complaint.  The first – the ground for the NLRB's coercive-questioning charge – occurred on May 13, 2020, when Edwards confronted Cromer about her treatment of the medical assistants, explaining that the assistants felt uncomfortable coming to Cromer themselves.  The parties agree that the confrontation became unpleasant, and while they dispute the particulars, the ALJ credited testimony that it was Cromer who became furious and yelled at Edwards to "get the fuck out of [her] office."  *Id.* at 9–10 & n.14.

Moments later, Cromer approached the medical assistants to ask whether it was true that they found her "unapproachable," as had been reported.  Cromer wanted to know "who . . . [felt] like they [couldn't] come and talk to [her]" and asked for a show of hands; none of the medical assistants responded because, they told Edwards, they were scared to say anything.  *Id.* at 10.  That afternoon, Cromer held a staff meeting, the details of which are not disputed:  Cromer began by stating that "she had been disrespected, that she had been talked about, and that she was putting an end to it."  *Id.* (internal quotation marks

---

[2] The ALJ's decision is available in the administrative record at A.R. 1408–33.  Our citations to this decision refer to its internal pagination.

omitted).    After announcing two new restrictive workplace policies, she finished by insisting that any remaining issues be raised with her "then and there," as the staff "had a lot to say behind her back and she was done with the pett[iness] and drama." *Id.* at 11.

The second critical incident – the basis for the NRLB's unlawful-firing charge – took place the next day, May 14, 2020.  That morning, Cromer and Edwards had another dispute, this time related to some documents Cromer had left on Edwards's desk.  The parties agree on "the basics of the situation" – an angry confrontation in Cromer's office – and the ALJ credited testimony that, again, it was Cromer who escalated and, again, yelled at Edwards to "get out of her fucking office."  *Id.* at 12 & n.23 (internal quotation marks omitted).    After some continued back-and-forth outside Cromer's office, Cromer told Edwards she was suspended and to "go home for the day." *Id.* at 12.

That brings us to the walkout at the heart of this case:  Edwards responded by saying that she would leave as instructed but that she was "taking the girls with [her]," and then, walking to the medical assistants' area of the office, said, "[L]et's go; let's roll out, girls." *Id.* at 13.  The medical assistants prepared to leave.  And while the parties' accounts have mostly overlapped until now, they diverge sharply at this point.  According to Cromer's testimony, Edwards and the medical assistants announced that they "quit." *Id*. at 15.  But the ALJ specifically rejected that testimony as lacking credibility, crediting instead testimony from multiple witnesses that Cromer pointed at each medical assistant and angrily declared, "[Y]ou're fired, you're fired, you're fired, you're fired." *Id.* at 14.  The medical assistants then left, followed shortly by Edwards.  That afternoon, Cromer sent

6

Edwards text messages wishing her "good luck in [her] future endeavors" and instructing her to return her office keys. *Id.* at 16.

## C.

The five employees – Edwards and the four medical assistants – filed separate unfair-labor-practice charges with the NLRB. After an investigation, the NLRB's General Counsel issued a single consolidated complaint against PRC.[3]

Following a four-day hearing, ALJ David I. Goldman issued a lengthy recommended decision and order identifying two violations of Section 8 of the Act. The ALJ began with an exhaustive recounting of the underlying facts, in which he mostly – but not entirely – adopted the accounts of the employees, making detailed credibility findings that sometimes reflected poorly on PRC's witnesses. Indeed, the ALJ voiced serious concern that PRC had attempted to introduce a fraudulent document – purportedly an employment contract between PRC and Edwards – into the proceedings by way of false testimony. *See* ALJ Decision at 17 ("What we are left with is suspect evidence, with signatures suggestive of fabrication, and with testimony that only enhances the suspicion

---

[3] About two weeks after the NLRB's complaint issued, PRC filed a lawsuit in North Carolina state court against all five employees, accusing them of defamation and breach of contract. PRC filed a motion to stay the administrative proceedings based on the state court lawsuit; the ALJ denied this motion. The NLRB later issued a decision finding that PRC's filing of the state court lawsuit, as well as some of its discovery requests, violated Section 8 of the Act, and it has now sought enforcement of that decision by this court. *See* Application for Enforcement, *NLRB v. Pain Relief Ctrs. P.A.*, No. 22-2157 (4th Cir. filed Nov. 10, 2022). That case has been held in abeyance pending the disposition of the application for enforcement and cross-petition for review at issue here.

7

that [PRC] attempted to submit a fraudulent document into evidence in a federal administrative law hearing.").

Based on that factual predicate, the ALJ determined, first, that in the May 13 incident described above, in which Cromer asked the medical assistants to identify themselves if they found her unapproachable, Cromer had unlawfully interrogated employees about activity protected under the Act – namely, their group discussions of what they felt was Cromer's abusive treatment of them at work, and Edwards's attempt to bring those complaints to Cromer's attention.[4]  Second, the ALJ found that on May 14, Edwards and the four medical assistants had been unlawfully discharged for participating in a walkout that also constituted concerted and protected activity under the Act.

PRC appealed, and the NLRB issued a decision and order affirming the ALJ's evidentiary rulings, factual findings, and legal conclusions.  The NLRB expressed its own concerns about PRC's litigation of the case and its effect on the integrity of the Board's processes.  The Board emphasized that submission of fraudulent evidence in an NLRB proceeding is a "serious matter" that may be criminally prosecuted, though it declined to make a referral to the Department of Justice in part because the ALJ had stopped short of a definitive ruling that PRC's "employment contract" was fabricated.  NLRB Decision &

---

[4] The General Counsel had also alleged, as an independent violation of Section 8 of the Act, that Cromer unlawfully polled employees to ascertain their support for protected concerted activities by asking them to raise their hands if they did not feel comfortable talking to her.  The ALJ found that "the alleged polling was simply part of the unlawful interrogation[,]" not a standalone violation, and so dismissed that allegation.  ALJ Decision at 19.  No party has challenged this part of the ALJ's ruling.

8

Order at 4.[5]  The Board also echoed the ALJ's "alarm regarding witness intimidation," based on an admission by PRC's counsel that he had instructed a front-office PRC employee not to speak with NLRB investigators. *Id.* at 3.  The NLRB "underscore[d] that interference with Board agents in the performance of their duties is proscribed" by the Act and also may be criminally punishable. *Id.* at 4.

Finally, the NLRB adopted the ALJ's recommendations as to relief with a few modifications.  Principally, PRC was ordered to cease and desist from engaging in unlawful employment practices; to reinstate and make whole the five complaining employees, compensating them for lost earnings and benefits; to eliminate any reference in employment records to the employees' unlawful discharges; and to post a notice to all employees regarding the outcome of the case.

## II.

The NLRB filed an application for enforcement of the NLRB's order in this court.  PRC then filed a cross-petition for review of the NLRB's order.  For the reasons given below, we grant the former and deny the latter.

Our review of the NLRB's order is deferential.  "[T]he function of effectuating national labor policy is often a difficult and delicate responsibility, which . . . Congress committed primarily to the Board, subject to limited judicial review." *Anheuser-Busch,*

---

[5] The NLRB's decision is available in the administrative record at A.R. 1404–08. Like the ALJ's decision, our citations to this decision also refer to its internal pagination.

*Inc. v. NLRB*, 338 F.3d 267, 273 (4th Cir. 2003) (internal quotation marks and alterations omitted). We will affirm the Board's legal interpretations if they are "rational and consistent with the Act." *Id.* (internal quotation marks omitted). And "[f]indings of fact made by an ALJ and affirmed by the Board are conclusive, so long as they are 'supported by substantial evidence on the record considered as a whole.'" *Id.* at 273–74 (quoting 29 U.S.C. § 160(e)). "[S]ubstantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," *id.* at 274; it is "more than a scintilla of evidence, but less than a preponderance," *Sinai Hosp. of Balt., Inc. v. NLRB*, 33 F.4th 715, 722 (4th Cir. 2022).

We begin with the agency's finding that PRC engaged in an unfair labor practice when Cromer questioned the medical assistants about their complaints that she was difficult to deal with. Under Section 8(a)(1) of the Act, an employer may not "interfere with, restrain, or coerce employees" in the exercise of protected rights. 29 U.S.C. § 158(a)(1). Questioning employees – even about concerted activity protected by Section 7 of the Act – is not *per se* unlawful, but it will "rise to the level" of a Section 8(a)(1) violation "if it is coercive in nature." *Intertape Polymer Corp. v. NLRB*, 801 F.3d 224, 230–31 (4th Cir. 2015). And conduct is coercive for purposes of Section 8(a)(1) if it "can have a deterrent effect on protected activity" – that is, if it might "chill[]" the exercise of Section 7 rights. *Medeco Sec. Locks, Inc. v. NLRB*, 142 F.3d 733, 745–46 (4th Cir. 1998).

Here, the ALJ found, and the NLRB agreed, that Cromer's questioning was directed at protected concerted activity, in the form of employee discussion of Cromer's perceived workplace abuses and Edwards's effort to broach those group concerns with Cromer. PRC

10

does not meaningfully dispute that determination on appeal. Instead, it focuses on the agency's second finding: that Cromer, when she "demanded to know . . . if it was true that she was unapproachable and demanded to know who felt that they could not talk to her," ALJ Decision at 18, engaged in coercive conduct that might deter employees from further exercising their right to air their shared complaints about her.

The ALJ based his coerciveness finding on an assessment of "all the relevant circumstances": The questioning was initiated by the office manager, a "high-ranking daily presence in the clinic"; it was "not casual" but instead "directed toward determining who was responsible" for a protected criticism that "clearly rankled Cromer"; and it immediately followed the "angry exchange" that resulted when Edwards raised the issue with Cromer in her office, overheard in part by many employees. *Id.* at 18–19. The "tendency of the interrogation to coerce" – that is, to chill the employees' future exercise of their right to discuss Cromer's perceived abuses – was aggravated at the meeting later that day, when Cromer continued to express her displeasure that employees had been "talking behind her back." *Id.* at 18. And that no employee was willing to admit to having participated in the criticism of Cromer, the ALJ reasoned, further supported a finding of coerciveness; under NLRB precedent, "[s]uch attempts by employees to conceal knowledge of protected activity weigh[] in favor of finding an interrogation unlawful." *Id.* at 19 (first citing *Camaco Lorain Mfg. Plant*, 356 NLRB 1182, 1183 (2011), and then citing *Evergreen Am.*, 348 NLRB 178, 208 (2006), *enforced*, 531 F.3d 321 (4th Cir. 2008)).

All told, the ALJ concluded that Cromer's questioning "would reasonably be understood by employees as coercive and intimidating" for purposes of Section 8(a)(1) of

11

the Act. ALJ Order at 18. That fact-intensive determination is subject to "considerable deference" on appeal. *Alton H. Piester, LLC v. NLRB*, 591 F.3d 332, 336 (4th Cir. 2010). Applying that deferential standard of review, we conclude that the agency's determination is supported by substantial evidence and consistent with the Act, and we therefore uphold it.

We reach the same conclusion as to the agency's finding that PRC violated Section 8(a)(1) when it discharged its employees for participating in a walkout. Here, PRC's primary argument on appeal – as before the agency – is that it did *not* in fact discharge the employees in question, who instead chose to quit their jobs. But as discussed above, the ALJ rejected that contention after an exhaustive review of the testimony and evidence presented over the course of a four-day hearing, based primarily on credibility judgments as to the testimony of Cromer and Hansen, on one side, and the employees, on the other. We will second-guess such credibility determinations only in "extraordinary circumstances," as when the determination is "unreasonable, contradicts other finds of fact, or is based on an inadequate reason or no reason at all." *WXGI, Inc. v. NLRB*, 243 F.3d 833, 842 (4th Cir. 2001) (internal quotation marks omitted). Here, by contrast, the ALJ provided thorough explanations, grounded in the record, for his credibility determinations, relying on such factors as witness demeanor, the level of detail in witness testimony, consistency of particular testimony with other testimony and record evidence, and general

12

plausibility.[6]  We thus decline PRC's invitation to revisit the ALJ's resolution of conflicting testimony on credibility grounds.

We have carefully considered PRC's remaining arguments.  Some were not properly raised at the agency level, which means that we do not review them now.  *See* 29 U.S.C. § 160(e); *NLRB v. HQM of Bayside LLC*, 518 F.3d 256, 262–63 (4th Cir. 2008).  Others were considered and rejected by the ALJ and the NLRB, with determinations supported by substantial evidence and reasoning that we find persuasive.  With respect to those claims, and for the reasons given by the agency, we uphold the position of the Board.

### III.

For the foregoing reasons, we grant the application for enforcement and deny the cross-petition for review.

*APPLICATION FOR ENFORCEMENT GRANTED;*
*CROSS-PETITION FOR REVIEW DENIED.*

---

[6] A complete recounting of the ALJ's credibility findings and explanations would do PRC no favors.  But by way of example, the ALJ at one point concluded:

> Cromer and . . . Hansen's testimony cannot be believed when it is disputed because in instance after instance, their testimony – usually in the form of endorsing a leading question by counsel – exhibited a pronounced and obvious tendency to testify, often in exaggerated form, in a manner they calculated would be the "right" answer . . . as opposed to their truthful recollection.

ALJ Order at 12 n.23.  Similarly, the ALJ found telling an unsubstantiated and "flippan[t]" charge by Cromer that the medical assistants had "cleared the computers" as an act of "sabotage" before being fired; the ALJ explained that this claim "reflect[ed] a reckless and casual attitude toward the oath of honesty that reared its head on more than one occasion in [the] proceeding."  *Id.* at 16 n.35.

WILKINSON, Circuit Judge, concurring:

I am happy to concur in Judge Harris's fine opinion. I also thank my good colleague, Judge Richardson, for his thoughtful dissent. The ALJ and Board gave this case a thorough look. It is not our job to do it over. Standards of review matter. Why even have a trier of fact if we are unwilling to accord presumptive weight to its conclusions and credibility assessments?

The record here plainly supports the ALJ's conclusions. It reveals Ms. Cromer's activity to be beyond rude and abusive, as she managed to spray misery throughout the workplace. Within that context, the ALJ was well within reason to find her questions coercive.

While my friend in dissent rightly emphasizes the speech values that a supervisor possesses in questioning, it will not do to overlook the speech values Congress sought to protect in Section 7. That provision allows collective action and communication among employees without the need for workers to go through all the formal steps necessary to form a union. *See NLRB v. Washington Aluminum Co.*, 370 U.S. 9, 14 (1962) (safeguarding the Section 7 rights of "a small group of employees who were wholly unorganized" to engage in concerted activities). Central to Section 7 is the ability of employees to speak freely among themselves. *Beth Israel Hosp. v. NLRB*, 437 U.S. 483, 491 (1978) ("[T]he right of employees to self-organize and bargain collectively established by § 7 of the NLRA . . . necessarily encompasses the right effectively to communicate with one another regarding self-organization at the jobsite.").

14

Ms. Cromer's conduct was designed to stifle exactly that. She sought to impose a code of silence upon the workplace to such an extent that critical comments about her managerial style put the workers at risk of losing their jobs. Her intention to do so was clear. At the conclusion of her interrogation, Ms. Cromer announced she would be calling a staff meeting. During that meeting, she chastised the employees for disrespecting her and said "she was putting an end to it." J.A. 1309. She also forbade the use of cell phones at the office going forward. *Id.* at 1310. Certainly, it could not have been far from the employees' minds that Ms. Cromer held their jobs in her hands. And indeed, she used that power the very next day to fire them as they walked out in protest.

I do not expect all workplace environments to be pristine. I further suppose that cases of this nature will be relatively infrequent. The NLRA does not demand that all managers be role models, and they may even be entitled to an ill-advised tantrum or two. Searching questioning of employees is often necessary to the efficient conduct of business. So an unpleasant workplace environment need not of itself establish a Section 7 violation. *Cf. Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (noting that "conduct that is merely offensive" without being "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment" is not actionable under Title VII). At some point, however, the line is crossed, and intemperate questioning can become an implicit threat. *See J.P. Stevens & Co. v. NLRB*, 638 F.2d 676, 686 (4th Cir. 1980). Coercion is all, I suppose, a matter of degree, and that is precisely where the trier of fact comes in.

15

I join Judge Harris's opinion because I do not believe that our labor laws leave workers speechless or otherwise immobile in the face of the oppressive conditions found by the ALJ and Board. And the basic recognition of Section 7 is that collective responses are often more effective in working change than individual ones. Common oppression often begets common responses. That is at the heart of the NLRA, and that is why I believe the ALJ and Board should be upheld.

RICHARDSON, Circuit Judge, dissenting in part and concurring in part:

This case is about what a supervisor can do when she realizes her coworkers don't like her. According to Congress, quite a bit; the National Labor Relations Act guarantees she can express her views and question theirs so long as she doesn't threaten or bribe them. But according to the National Labor Relations Board and my friends in the majority, not much. They seem to believe that unless she can say something nicely, its best—and indeed statutorily required—that she say nothing at all.

The medical assistants at Pain Relief Centers did not like their office manager, Sharese Cromer. They found her management style disrespectful and her interactions with them belittling. In short, they thought she was a bully. They discussed her behavior often. When a nurse told Cromer some of what they had been saying, she became upset. She confronted them and asked them if what she had heard was true. So tensions were high when, the next day, Cromer got in a fight with the same nurse. It escalated. The nurse was suspended and then fired. The medical assistants walked off the job in protest. On their way out the door, Cromer fired them all.

I agree with the majority that the Board reasonably concluded the workers were fired and their firing was unlawful. Yet to conclude Cromer violated the National Labor Relations Act when she questioned her coworkers goes too far. And the Board bypassed an entire provision of the Act to do it. Since the majority errs by approving this overreach, I respectfully dissent.

## I.    Background

The majority does a good job hitting the high notes on the facts, but they deserve a closer look.  Focus on what precipitated Cromer's allegedly "coercive" questioning.  That questioning grew out of the tension between Pain Relief's medical assistants and Cromer.  This tension was illustrated for the Board through a series of recounted events.[1]  For example, Cromer told a medical assistant in a "bullying" tone that she needed to be "glued" to her boss's hip when assisting him.  A.R. 1411.  Cromer made another medical assistant resolve an interoffice dispute in a public setting rather than a private one.  Cromer told that same medical assistant to stop being "lazy" and go treat patients in their cars rather than by yelling to them.[2]  A.R. 1411.  Similarly, Cromer publicly threatened to send some of the medical assistants home without pay if they shouted to patients in the drive-thru lane (activity that she felt risked patient privacy).  She also yelled at the medical assistants to clean up the clinic.[3]  They discussed this purportedly "disrespectful" and "unprofessional" treatment among themselves and with one of Pain Relief's nurses, Krisandra Edwards.  A.R. 1411.

---

[1] Technically an ALJ took this evidence and issued an initial decision, not the Board. But the Board affirmed that decision for the reasons the ALJ gave and attached the ALJ's decision to its own.  So I use "the Board" when referring to the agency even when the ALJ is also implicated.

[2] Pain Relief was seeing patients in their cars in a drive-thru lane at the time because of COVID.

[3] Cleaning the clinic was one of their job duties.  This time, Cromer told them that the boss's wife was upset about the dirty office and wanted to fire "all of us"—presumably including Cromer—and so Cromer ordered the medical assistants to clean before "everybody gets fired."  A.R. 1411.

Against this backdrop of simmering tension, the catalyst for Cromer's questioning at issue here was a text exchange between Edwards and Cromer. Edwards texted Cromer informing her that the administrative staff (who worked directly under Cromer) left early for the day while the medical staff (who effectively reported to Edwards) remained behind. A.R. 1412 ("Hey just let you know while front office jetted and we are still back here working and yes I'm tattling because I can! Sorry[.]"). Cromer responded "Got it," and then spoke with Edwards on the phone to tell her that "we [a]re going to all be working longer hours,"[4] and then sent a text to both the medical and administrative employees. A.R. 1412. That text notified recipients that they had to stay through the end of the workday and that, next week, the end of the workday would move from 3:30 pm to 5:00 pm. It also warned them that any employee leaving early would be fired.

Edwards did not like that text. The next day she confronted Cromer in Cromer's office, she admonished Cromer for reprimanding the medical staff when it was the administrative staff who left early. From Cromer's perspective, however, the text allowed her to solve two problems at once: stopping employees from leaving early and announcing the new, post-COVID, schedule. Edwards revealed to Cromer that the medical assistants were uncomfortable coming directly to Cromer with their issues. Their conversation escalated as each became increasingly angry with the other, ending when Cromer swore at Edwards and told Edwards to leave her office. Edwards left and made her way to the back of the clinic where the medical assistants sat.

---

[4] The office was ramping back up from a reduced COVID schedule.

19

Cromer followed her and confronted the medical assistants. It was then that she engaged in the alleged coercive interrogation. She said she heard they thought she was unapproachable and asked if that was true. A.R. 1413 ("[I]t's been brought to my attention that I'm unapproachable. Is that true?"). She asked "who back here feels like they can't come and talk to me," inviting them to raise their hands in response. A.R. 1413. When no one did, she said "well, there sure is a lot of talking going on about me back here." A.R. 1413. She then announced that there would be an office meeting later that day and left the area. That was it. And—according to the majority—that violates federal law.

## II.    Analysis

The Board held that Cromer's questioning was an "unfair labor practice" in violation of 29 U.S.C. § 158(a)(1). It is an unfair labor practice to "coerce" employees, § 158(a)(1), in the exercise of their right to "engage in … concerted activity for the purpose of . . . mutual aid or protection," *id.* § 157. There are thus two parts to the Board's finding: Cromer's questioning was (1) coercive and (2) about a protected activity. A.R. 1405 ("[Cromer] violated [the Act] by coercively interrogating [the] medical assistants about their . . . protected concerted activity.").

Both holdings are highly suspect. On the first, the Board applied the wrong legal standard. So I would vacate and remand this case for it to apply the correct one. And, under the correct standard, it is hard to imagine the Board's conclusion could hold. Since I would vacate based on the first finding, I would not reach the second.

20

### A.      The Board applied the wrong legal standard to find coercion

An employer can violate the Act by asking her employees questions.  The theory being that questioning can be a way to send veiled—or not so veiled—signals to employees to stop trying to improve their working conditions.  But for questioning to violate the Act, it must be coercive.  And to decide whether questioning is coercive, the Board "must consider a variety of factors including the history of employer hostility to [employee protected activity], the nature of information sought, the identity of the questioner, and the place and method of questioning."  *See Intertape Polymer Corp. v. NLRB*, 801 F.3d 224, 231 (4th Cir. 2015) (quoting *NLRB v. Nueva Eng'g, Inc.*, 761 F.2d 961, 966 (4th Cir. 1985)).

But that's not all.  Our test for whether questioning is coercive enough to violate § 158(a)(1) must be read alongside § 158(c).  *See Intertape Polymer Corp.*, 801 F.3d at 230 (acknowledging that "the prohibition set forth in § 158(a)(1) is limited by the protection granted by § [158](c)" (cleaned up)).  That provision largely codifies an employer's First Amendment rights, *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 617 (1969), ensuring that she can question her employees as long as those questions do not contain any "threat of reprisal," § 158(c).[5]  So an employer's questioning can be an unfair labor practice—in

---

[5] In full, the provision guarantees that:

The expressing of any views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, *shall not constitute or be evidence of an unfair labor practice under any of the provisions of this subchapter*, if such expression contains no threat of reprisal or force or promise of benefit.

(Continued)

other words, can be unlawfully "coercive"—only if the employer threatens the employee with retaliation for engaging in a protected activity.

With an understanding of § 158's requirements, let's turn to the Board's work to see how it did. Not well. To start, even putting § 158(c)'s requirement to the side, it did not meaningfully engage with the rest of the § 158(a)(1) factors. At no point does it mention if Pain Relief has a history of hostility towards protected activity (it does not). And it gives cursory treatment to the rest. Indeed, the Board's case for finding coercion is exceedingly thin. It essentially consists of Cromer being a supervisor who asked "not casual" questions about a topic that "clearly rankled" her.[6] A.R. 1421. It also puts weight on the fact that the employees did not raise their hands when Cromer asked them who found her unapproachable. A.R. 1422 ("Such attempts by employees to conceal knowledge of protected activity weigh in favor of finding an interrogation unlawful.").

Yet "not casual" does not equal "coercive," even if the questioner is frustrated. And nearly every § 158(a)(1) case will involve a supervisor. So it's unclear what this fact adds

---

§ 158(c) (emphasis added). Threats of force and promises of benefit are not implicated here, so I do not discuss that portion of § 158(c).

[6] The Board and the majority cite several things showing that Cromer was noticeably upset by the medical assistants' conduct and opinions about her, including her prior confrontation with Edwards and the office meeting later that day. A.R. 1421.

22

to the discussion.  It is also unreasonable to find that the medical assistants' silence here is evidence of Cromer's coercion since response is a poor barometer for coercion.[7]

Still, if the Board's problems ended there, I might uphold its coercion determination under our deferential standard of review.  But I can't do that.  Because the Board's analysis is not just uninspired and, frankly, a little puzzling; it is also incomplete:  The Board never found that Cromer *threatened* the medical assistants with retaliation for engaging in a protected activity, as required by § 158(c).

True, the Board purported to apply a "coercion" test that rhymes with our Circuit's test.  *Compare* A.R. 1421 ("The test is whether the employer engaged in conduct which, it may reasonably be said, tends to interfere with the free exercise of employee rights under the Act" (quoting *American Freightways Co.*, 124 NLRB 146, 147 (1959))), *with Medeco Sec. Locks, Inc. v. NLRB*, 142 F.3d 733, 745 (4th Cir. 1998) ("[T]he well-settled test . . . is whether 'under all the circumstances the employer's conduct may reasonably tend to coerce . . . employees'" (quoting *NLRB v. Grand Canyon Mining Co.*, 116 F.3d 1039, 1044 (4th Cir. 1997))), *and id.* ("An employer's coercive action affects protected rights whenever it can have a deterrent effect on protected activity.").

---

[7] I'm not suggesting employees are required to give into coercion before we find it present.  A question can be coercive with or without a response.  One might be frightened into silence.  But so too might a coercive question actually coerce an answer.  In other words, the absence of giving in cannot be evidence of coercion since giving in is also evidence of coercion.  The Board's approach that could allow both silence and response to prove coercion presents quite the Catch-22.  *Cf.* Joseph Heller, Catch-22 at 46 (1961) ("Orr was crazy and could be grounded.  All he had to do was ask; and as soon as he did, he would no longer be crazy and would have to fly more missions.").

Yet our test is informed by an acknowledgment that coercion *must* include a threat.[8] *See id.* at 744 (explaining an ALJ's coercive-speech finding "cannot stand" absent the threat of reprisal). In statute and in precedent, § 158(a)(1) and (c) are unambiguously two sides to the same coin: an employer cannot violate the former if they are within the latter. In other words, when we say questioning is coercive if it has "a reasonable tendency in the totality of the circumstances to intimidate," we understand those words to require the questioning contain a threat to have that tendency. *Intertape Polymer Corp.*, 801 F.3d at 230 (quoting *Nueva Eng'g, Inc.*, 761 F.2d at 965).

Or at least we used to. That is why it was significant in *Intertape Polymer Corp.*, 801 F.3d at 231, that the employer told the employee that union support could "hurt" them; in *J.P. Stevens & Co., Inc. v. NLRB*, 638 F.2d 676, 686 (4th Cir. 1980), that the employer's speech "contained implied threats of retaliation"; and in *Corrie Corp. of Charleston v. NLRB*, 375 F.2d 149, 153 (1967), that the questioning occurred just one hour after the employer fired the main union organizers.

But today the majority affirms the Board's conclusions wholesale. And I am hard pressed to find evidence that Cromer threatened these medical assistants with retaliation for engaging in a protected activity. She certainly did not make an "open threat of reprisal" for such activity. *See Nueva Eng'g, Inc.*, 761 F.2d at 966. Nor did she say anything that "clearly indicated" she was laying "the grounds for future termination." *NLRB v. Air Contact Transp. Inc.*, 403 F.3d 206, 213 (4th Cir. 2005). And Pain Relief had no prior

---

[8] Again, it's not implicated here but, coercive questioning could alternatively (or additionally) contain a "promise of benefit." § 158(c).

24

"history of unlawful retaliation" for protected activity. *See J.P. Stevens*, 638 F.2d at 685. Instead, Cromer engaged in a line of questioning that was "not casual" about a topic that "clearly rankled" her. A.R. 1421. It is hard to see how that is enough to strip away her § 158(c) protections.

More importantly, it is not my job—under our precedent—to look for that evidence in the first instance. *See Portillo Flores v. Garland*, 3 F.4th 615, 637 (4th Cir. 2021) (en banc) ("[A]gencies [must] do their jobs so that we can do ours."). We should vacate the Board's decision and remand this case so it can apply the proper legal standard. *See NLRB v. Kentucky River Cmty. Care, Inc.*, 532 U.S. 706, 721–22 (2001). Because, while the Board paid lip service to the correct test, it never asked if Cromer threatened the medical assistants for engaging in a protected activity. It therefore sought a "coercive interrogation" in name only. *Cf. Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 373 (1998) ("It is certainly conceivable that an adjudicating agency might consistently require a particular substantive standard to be established by a quantity or character of evidence so far beyond what reason and logic would require as to make it apparent that the *announced* standard is not *really* the effective one.").

**B.      Cromer's questioning was likely not about a protected activity**

To be clear, I would stop after finding the Board applied the wrong coercion test. But since the majority fully affirms the Board's decision, I'll go further: the Board also likely erred by finding Cromer's questions were "about" a protected activity. A.R. 1405. A protected activity is one done "for the purpose of collective bargaining or other mutual aid or protection." *New River Indus., Inc. v. NLRB*, 945 F.2d 1290, 1294 (4th Cir. 1991)

25

(quoting § 157)).  I'm doubtful Cromer questioned the medical assistants about anything fitting this description.

The majority breezes past this point, saying that Pain Relief did not "meaningfully dispute" it on appeal.  Majority Op. at 11.  Perhaps.  *But see* Appellant's Br. at 26–27 ("Cromer's questions to [the medical assistants] . . . appeared to be of a personal nature, and not out of any knowledge or concern of concerted activity. . . . There was nothing in the question relating to unions, organizing activity or concerted activity."); Appellant's Reply Br. at 25–27 (similar).  And, in its haste, the majority adopts the Board's expansive characterization of the scope of Cromer's questions:  "Cromer's questioning was directed at protected concerted activity, in the form of employee discussion of Cromer's perceived workplace abuses and Edwards's effort to broach those group concerns with Cromer." Majority Op. at 10.

But such a characterization is not just expansive, it is downright implausible.  The record reflects that Cromer's questions were confined to asking "if it was true that she was unapproachable," not investigating broader discussions of workplace abuse.  A.R. 1421, 1413 ("[I]t's been brought to my attention that I'm unapproachable.  Is that true?").  Indeed, the government never alleged anything else.  A.R. 1409 ("The government alleges that the office manager unlawfully interrogated . . . the employees when she demanded to know who believed she was unapproachable.").  In fairness, the Board had seen evidence that the medical assistants spoke to each other about other aspects of Cromer's leadership they disliked.  Yet nothing suggests Cromer asked about those conversations when she questioned the medical assistants.  It's not even clear whether Cromer knew about them.

26

Even taking the majority's version of the questioning, Cromer's hypothetical questions might still not be about protected activity. Although I'll admit our caselaw is far from clear on this front.

As an overarching consideration, we have required employees who claim to be engaged in protected activity to show that they "intended to resolve or call attention to *conditions of employment*." *See New River Indus.*, 945 F.2d at 1295 (emphasis added).[9] So discussing—or otherwise organizing against—an unpopular boss's management style is not protected since it is not aimed at adjusting a "condition of employment." *See id.*; *Joanna Cotton Mills Co. v. NLRB*, 176 F.2d 749, 753–54 (4th Cir. 1949).

Is our protected-activity caselaw contrary to the NLRB's? Arguably. *Compare New River Indus.*, 945 F.2d at 1295 (employee letter criticizing unappreciative management not protected), *and Joanna Cotton Mills Co.*, 176 F.2d at 753 (employee's petition to get rid of supervisor "with whom he was angry" not protected), *with Dignity Health*, 360 NLRB 1130, 1131–32 (2014) (employee's petition to highlight co-worker's

_____

[9] It is hard to square *New River*'s singular focus on conditions of employment with the Supreme Court's statement that employees are protected whenever they seek "to improve terms and conditions of employment *or otherwise improve their lot as employees*." *Eastex, Inc. v. NLRB*, 437 U.S. 556, 565 (1978) (emphasis added). But we are bound by *New River*'s application of *Eastex*.

There is also some support for its approach. Including from the Supreme Court, *see NLRB v. Washington Aluminum Co.*, 370 U.S. 9, 15 (1962), and other Circuits, *see, e.g.*, *Off. & Pro. Emps. Int'l Union v. NLRB,* 981 F.2d 76, 82 (2d Cir. 1992) ("But the Act does not protect any [activity] engaged in by an employee if it is unrelated to the terms and conditions of employment. Although this discussion seems obvious, it is clear that the Board ignored this commonsensical approach to the Act in this case."); *Brown & Root, Inc. v. NLRB*, 634 F.2d 816, 818 (5th Cir. 1981) ("Employees' activities are protected by [§ 157] if they might reasonably be expected to affect terms or conditions of employment.").

"attitude" protected).  There is at least considerable tension between the two.  What is to be done about this inconsistency?  That is a harder question.

One option would be to admit the inconsistency, declare that a genuine statutory ambiguity exists, *see Kisor v. Wilkie*, 139 S. Ct. 2400, 2415 (2019), and find that the Board's interpretation is still reasonable and must be followed.  *See Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 982 (2005).  Maybe that is the correct approach under current precedent.  But to take it we would have to first explain why we now find reasonable a Board interpretation that looks a lot like the one we rejected in *New River*.

Another option—let's call it the "majority's approach"—is to pretend the inconsistency does not exist and approve whatever the NLRB finds.  That doesn't feel right.  If our caselaw is wrong, we should fix it.  And if it is right, we should adhere to it.  Pretending the standards are the same just allows them to drift further apart, making the inevitable reconciliation all the more jarring.

A final option would be to follow—and likely clarify—our precedent.  If we chose this path, the medical assistants would be engaged in a protected activity only if their discussions about Cromer's "manner, tone, threats of termination, and perceived demeaning treatment of employees," A.R. 1421, were "intended to resolve or call attention to conditions of employment," *see New River Indus.*, 945 F.2d at 1295.  Maybe they were.  While general management style and personality disputes are not conditions of employment, we know from other areas of the law that certain abusive environments are. *See, e.g.*, *Harris v. Forklift Syst., Inc.*, 510 U.S. 17, 21 (1993).  And talking about "threats

of termination" might—on its own—count as trying to improve one's "wages, benefits, working hours, the physical environment, dress codes, assignments, responsibilities, and the like." *See New River Indus.*, 945 F.2d at 1294 (defining "conditions of employment").

If I got there, I'd likely choose the third option. And, honestly, I am not sure where it would take me. But I would not go down that road now. Instead, I would take one of the many off ramps.

*          *          *

By finding that Cromer's questioning was an unfair employment practice, the Board essentially eliminates an employer's § 158(c)'s rights. Supervisors should note this erosion. The Board has decided to no longer afford them Congress's promised protections. And we affirm its decision. That's a mistake. Courts giving deference can forgive a great manner of sins, but we should never allow an agency to ignore Congress. Since the majority does, I respectfully dissent.

29